WHITMAN'S CANDIES,
INC., Respondent.

v.

PET INCORPORATED, Appellant.

No. WD 54041.

Missouri Court of Appeals,
Western District.

June 2, 1998.

Motion for Rehearing and/or Transfer to
Supreme Court July 28, 1998.

Application to Transfer Denied
Sept. 22, 1998.

Bernard J. Rhodes, Kansas City, for Respondent.

Robert L. Ward, Kansas City, for Appellant.

Before BRECKENRIDGE, P.J., and LOWENSTEIN and SPINDEN, JJ.

LOWENSTEIN, Judge.

This case involves the interpretation and breach of a contract—the Assets Purchase Agreement ("the Agreement")—in which defendant and appellant Pet, Inc. ("Seller") agreed to sell the assets of its Whitman's Chocolates Division to plaintiff-respondent, a newly-formed corporation called Whitman's Candies, Inc. ("Buyer"). This action is by Whitman's, the Buyer, against Pet, the Seller, for breach of contract.

The facts, as indicated by the record and viewed in the light most favorable to the verdict, are as follows. In 1992, Pet, a large food company, decided to sell its Whitman's chocolates division, which made and sold boxed chocolates under the well-known "Whitman's" name. After learning of Pet's desire to sell its Chocolates Division, Louis Ward, who was then president of Russell Stover Candies, and his two sons, Tom and Scott, both of which were involved in the candy business at Russell Stover, considered purchasing Pet's chocolates division for Rus-

sell Stover Candies.[1] After much contemplation, the Ward family decided that the two sons, along with their sister, would form a separate corporation for the purpose of purchasing the assets of Pet's chocolates division, in order to avoid increased estate taxes for Louis Ward. That corporation, Whitman's Candies, Inc., was the actual purchaser of the assets and is the other party, along with Pet, to the Agreement.[2] In other words, Whitman's chocolates were originally made by Pet; then Pet decided to get out of the candy business. Russell Stover, who also made chocolate candies, decided to buy the Whitman's name and assets from Pet. Russell Stover then formed a corporation, Whitman's Candies, Inc., to purchase and run the Whitman's operation.

The Agreement, which governed the rights, responsibilities, and conduct of both parties with regards to the sale of Seller's chocolates division to Buyer, was dated March 5, 1993. The parties agreed on a purchase price of $13.5 million for Seller's assets, of which one million was allocated to the purchase of the Whitman's trademark. Because Seller had sold all its rights to the Whitman's name, Seller could not sell its existing inventory of candy without permission from Buyer. Anticipating this situation, the parties inserted a provision into the Agreement, specifically § 8.2, which allowed Seller to continue to operate their chocolate division during a winding-down period[3] until all of Seller's existing inventory was sold. Seller stopped making boxed chocolates in May of 1993 and completed selling its inventory by the end of 1993. Section 8.2 further provided that Seller could only sell its existing inventory so long as, during the Reservation of Rights period, it did "not make or institute any unusual or novel methods of manufacture, purchase, sale or operation that will vary materially from those methods previously used by Seller" and that Seller would

"use its best efforts to maintain the goodwill and reputation associated with the [t]rademarks."

At trial, the evidence established that at the time the Agreement was signed, Seller had a policy in place to insure that only fresh candy was sold to the public by buying back out-of-date candy from retailers at 50% of its cost. Testimony revealed that such a policy is "standard in the box chocolate business," and that Seller's use of this policy was "extremely important" to Buyer at the time of the purchase. Specifically, Seller's own "Policy Governing Adjustment on Returned Goods," or freshness policy, provided that retailers should remove candy from their shelves that was one year old, damaged, or stale, and that Seller would credit the retailer 50% of the retailer's cost for doing so. Retailers could receive this credit in the form of a check or as a credit against future invoices.

However, during the Reservation of Rights period Seller discontinued its longstanding freshness policy and told retailers that all sales of candy after July 1, 1993, would be "final." Retailers were informed by Seller that candy they bought from Seller after this date would no longer be eligible for a 50% credit if it became outdated. To compensate for this change in policy, Seller sold the "final sale" candy to retailers at a discount. The practical effect of this change in policy was that many retailers would leave outdated candy on their shelves rather than replacing it with fresh candy because they did not want to take a total loss for the old candy.

At trial, Buyer sued Seller for breach of contract in three counts. Count I sought $264,000 for Seller's failure to indemnify Buyer for the credits retailers took against Buyer's invoices when the retailers removed outdated Seller-manufactured candy from their shelves. Count II sought $364,000 for

---

1. Tom Ward, who is president of Whitman's, is now also president of Russell Stover Candies. Louis Ward has since passed away.

2. Although Whitman's is the owner of the assets, it is Russell Stover that actually makes the candy that goes into the Whitman's boxed chocolates. Russell Stover's sales force is also used to sell Whitman's products.

3. The Agreement called this winding-down period the "Reservation of Rights Period." Both parties have agreed that the Reservation of Rights period ended on December 31, 1993, when Pet finished selling its existing inventory.

display racks that Buyer claimed it had purchased and that Seller had improperly sold to retailers during the Reservation of Rights period. Count III sought to recover lost profits resulting from a breach by Seller when they discontinued their policy of monitoring for outdated, spoiled, or defective candy and offering a 50% credit to retailers for such candy.

The case was tried to a jury, which awarded Buyer $264,000 on the indemnity claim, $364,000 on the display rack claim, and $3 million in lost profits. The trial judge entered judgment in these amounts and awarded plaintiff $236,611 in attorney fees pursuant to § 10 of the Agreement.

## Indemnity Claim

When Buyer's representatives began selling their own Buyer-manufactured boxed chocolates to retailers, they informed retailers that the Seller-manufactured candy was outdated and should be removed from their shelves. In response to Buyer's comments, some retailers did remove the candy from their shelves. In addition, many retailers took a 50% credit for the outdated *Seller*-manufactured candy against the next invoice retailers received from *Buyer*. Buyer sought reimbursement for these credits under § 9.1 of the Agreement, which provided that Seller would indemnify Buyer for "any liabilities or obligations of, *or claims against,* all or any portion of the Business arising out of or relating to" the Reservation of Rights period. Seller regularly reimbursed Buyer for these claims for 14 months. However, after June 18, 1994, Seller stopped reimbursing Buyer for the credits, claiming that, under § 9.2(c) of the Agreement, Buyer had to notify Seller of any claims for indemnification by June 18, 1994. At trial, the parties stipulated that the unreimbursed credits for claims submitted to Seller after June 18, 1994, totaled $264,658.

## Lost Profits Claim

Without objection by Seller, evidence was introduced at trial showing that more than 400,000 boxes of outdated chocolates manufactured by Seller had been sold in the United States since Seller discontinued its fresh-ness policy. In response to their purchase of Seller's stale, outdated candy, numerous retail consumers wrote letters stating, among other things, that they "had to throw away the entire box," that the chocolates were "old and stale," and that they were "never going to buy Whitman candy again."

Buyer called Dr. Richard Oliver, a consumer psychologist, to testify as to his expert opinion on the number of dissatisfied consumers who would now refuse to buy candy sold under the Whitman's name. Dr. Oliver, having spent more than twenty years studying consumer response, testified that the process he used in arriving at his opinion was generally accepted within the consumer satisfaction field. Using published studies of consumer behavior and market research, Dr. Oliver determined that Buyer would lose sales of 2.711 million boxes of candy over a three year period. In Dr. Oliver's opinion, three years was the "average" period of time a buyer would go before purchasing a box of Whitman's chocolates again. Dr. Oliver multiplied the lost sales of 2.711 million boxes of chocolates by Buyer's per box profit margin of $1.79, and concluded that Buyer was damaged in the amount of $4,852,690 as a result of the sale of the 400,000 boxes of stale and outdated Seller-manufactured candy. Tom Ward, president of Buyer, testified that for every box of chocolates Buyer sells they make $1.79 profit.

## Display Racks Claim

As part of the purchase price, Buyer bought certain display racks that retailers used to display Whitman's Candy. Section 2.1 of the Agreement defined what assets were included in the purchase price and included "all display racks" located at the plant as set forth in Schedule 4.7. Schedule 4.7 listed the "Other Tangible Assets being purchased by the Buyer, subject to modification pursuant to § 8.1" and included "all display racks" as well. Buyer introduced evidence that on or about the day of closing, Seller had $612,612 worth of display racks at its plant. Buyer also introduced evidence that Seller only delivered racks worth $248,426, and argued that Seller owed Buyer $364,186 for the undelivered display racks.

## Submissibility of Lost Profits Claim

In its first point on appeal, Seller argues that the trial court erred in submitting Buyer's claim for lost profits to the jury because: (a) the lost profits claim depended upon the Agreement imposing a continuing duty upon Seller to remove outdated Seller candy from retailers' shelves, and no such duty existed in the Agreement; and (b) Buyer failed to introduce evidence of past profitability or of actual costs or expenses of its business.

■ In reviewing the submissibility of a case, this court views the evidence in the light most favorable to the verdict. *Refrigeration Industries, Inc. v. Nemmers*, 880 S.W.2d 912, 916 (Mo.App.1994). Buyer is entitled to the benefit of all favorable inferences that may be reasonably drawn from the evidence. *Clayton Center Assoc. v. W.R. Grace & Co.*, 861 S.W.2d 686, 689[3] (Mo. App.1993). This court disregards the Seller's evidence except to the extent that it supports the Buyer's case. *Id.*

### A. Seller had a Duty to Maintain its Freshness Policy

■ In it's first point, Seller argues that Buyer's claim for lost profits must fail because it depended upon the Agreement imposing a continuing duty upon Seller to remove outdated Seller candy from retailers' shelves, and that no such duty existed in the Agreement. Essentially, Seller views Buyer's claim as one that required Seller to "guarantee that all outdated candy would be removed" from retailer's shelves. However, Seller's brief misconstrues the terms of the agreement and the essence of Buyer's claim. The claim is most easily understood by viewing the verdict director submitted at trial. The verdict director stated that:

Your verdict must be for [Buyer] if you believe:

First, [Buyer] and [Seller] entered into an agreement whereby defendant agreed not to discontinue its policy for outdated candy, and Second, [Seller] failed to perform such agreement, and Third, [Buyer] was thereby damaged.

Buyer did not claim that Seller had a duty to, in fact, remove all outdated Seller-manufactured candy from the retailer's shelves, rather Buyer claimed that, under § 8.2 of the Agreement, Seller had a contractual duty, during the Reservation of Rights period, to "not make or initiate any unusual or novel methods of manufacture, purchase, sale or operation that will vary materially from those methods previously used by Seller." Specifically, Buyer argued that Seller breached § 8.2 when it discontinued its freshness policy, and that Buyer was thereby damaged.

■ Upon recognizing the exact nature of Buyer's claim, it becomes easier to address Seller's arguments. Within its first point, Seller claims that the Agreement cannot be read to require Pet to maintain its freshness policy because the Agreement states in § 8.2 that Seller is "liquidating the Inventories and discontinuing its operation of the Whitman's business." [4] However, this language cannot be read to void the provision of § 8.2 that states that Seller will not "make or institute any unusual or novel methods ... of sale or operation." It is well-accepted in contract law that one provision of a contract will not be read to void another provision of the same contract. Seeming contradictions must be harmonized away if reasonably possible. *CB Commercial Real Estate v. Equity Partnerships Corp.*, 917 S.W.2d 641, 646 (Mo.App. 1996).

In the present case, there was nothing preventing Seller from maintaining its freshness policy *and* getting out of the candy business. Seller continued collecting its accounts receivable after it discontinued its credit policy. In fact, the same memo that

4. Section 8.2 provides, in pertinent part: " During the Reservation of Rights Period, Seller will operate the Business diligently and, to the extent possible acknowledging that Seller will be liquidating the Inventories and discontinuing its operation of the Whitman's Business, in substantially the same manner as it previously had been operated, and shall not make or institute any unusual or novel methods of manufacture, purchase, sale or operation that will vary materially from those methods previously used by Seller. Seller further will proceed with the orderly and efficient sale of all Inventories and shall at all times use its best efforts to maintain the goodwill and reputation associated with the Trademarks." (emphasis added).

terminated Seller's freshness policy for outdated candy, stated that "[a]ccounting functions and credits will be maintained by [Seller] until all business issues are resolved. Customers do not need to withhold payment of invoices to insure proper resolution of outstanding claims." Surely Seller could have used these same accounting clerks to handle credits for outdated candy as well. Seller's argument, that the language "liquidating the Inventories and discontinuing its operation of the Whitman's business" somehow obviates its need to maintain its freshness policy, fails.

Seller next argues that, in spite of the clear language of § 8.2, that Buyer's theory depended on finding an implied term in the contract that Seller would remove old candy from retailer's shelves. As previously discussed, Seller has misconstrued Buyer's claim. Buyer never alleged that Seller was required to remove all outdated candy, and this was not the claim submitted to the jury. The Agreement dictated the terms of Buyer's claim, and § 8.2 of the Agreement stated that Seller would not alter any material methods of sale during the Reservations of Rights period. Buyer simply alleged that Seller's discontinuation of its freshness policy constituted an express breach of the Agreement, and that it was thereby damaged. Seller's argument regarding implied terms is without merit.

As stated earlier, the evidence at trial established that, for more than a decade, Seller had a policy of buying back out-of-date candy from retailers at 50% of its cost. The undisputed evidence also established that this policy was implemented to ensure that only fresh candy was on the retailer's shelves. Seller's own "Policy Governing Adjustment on Returned Goods" stated that, "[f]resh candy is the single, most important prerequisite to building and maintaining a successful packaged candy business. Stale candy can only reflect on your store and hurt your sales." Given Seller's own policy statement, it is without question that Seller's discontinuation of this policy constituted a "material" alteration in Seller's methods of sale or operation under § 8.2. As such, this court finds that Seller did have a duty to maintain its freshness policy during the Reservation of Rights period.

■ Seller next argues that it did not breach § 8.2 of the Agreement because it did not change the freshness policy during the Reservation of Rights period. At trial, it was undisputed that the Reservation of Rights period began on March 5, 1993 and ended on December 31, 1993. Likewise, it was undisputed that, effective July 1, 1993, Seller no longer offered a 50% credit for candy sold after that date that became outdated. Notwithstanding, Seller alleges that any credits on candy sold after July 1, 1993, would not have been due until 1994, and thus the change of policy occurred outside the Reservation of Rights period. This argument is not persuasive. The policy was altered as of July 1, 1993—clearly within the Reservation of Rights period. The fact that credits would not come due until one year later in 1994 is inconsequential.

## B. Buyer's Evidence of Lost Profits was Sufficient

■ As its second point of error, Seller argues that the trial court erred in submitting Buyer's claim of lost profits to the jury because Buyer failed to introduce evidence of past profitability or of actual costs or expenses of its business. Specifically, Seller claims that Buyer's proof of lost profit damages fails in two parts. First, that the testimony of Dr. Oliver should never have been admitted because, among other things, it was too speculative. This argument is addressed under the immediately following section. Second, Seller argues that Buyer's proof of lost profits lacked the "strict certainty" required by Missouri law. As mentioned earlier, in reviewing the trial court's decision to deny Seller's motion for judgment notwithstanding the verdict, the evidence, along with all reasonable inferences deducible therefrom, must be viewed in the light most favorable to Buyer. *Luyties Pharmacal Co. v. Frederic Co., Inc.,* 716 S.W.2d 831, 833 (Mo. App.1986). All contrary evidence is disregarded. *Id.*

■ Missouri law regarding lost profits has delineated a distinction between evidence establishing the fact of damage and evidence

establishing the amount of damage. *Gasser v. John Knox Village*, 761 S.W.2d 728, 731 (Mo.App.1988). It is the fact of damages which must be proven with reasonable certainty. *Id.* In Gasser, this court stated:

> Where the damages are in the nature of lost profits, all that can be required [of the plaintiff] is to produce all the relevant facts tending to show the extent of the damages and one is not excused for a breach of contract resulting in damages simply because those damages may not be established with certainty.

*Id.* at 731. Similarly, in *Ranch Hand Foods v. Polar Pak Foods, Inc.*, 690 S.W.2d 437, 444–45 (Mo.App.1985), this distinction was specifically applied to claims for lost profits. The court in Ranch Hands Foods held that,

> In some cases the evidence weighed in common experience demonstrates that a substantial pecuniary loss has occurred, but at the same time it is apparent that the loss is of a character which defies exact proof. In that situation, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the court or jury. This principle is applicable in the case of proof of lost profits.

*Id.* (citations omitted).

█ The evidence adduced at trial indicates that Buyer sustained a substantial pecuniary loss. There was uncontested evidence, though UPC data, which showed that more than 400,000 boxes of Seller's out-of-date stale candy were sold to consumers. Seller's own policy statement recognized the detrimental effect stale candy can have on future sales when it pointed out that, "[s]tale candy can only reflect on your store and hurt your sales." In addition, the numerous letters from consumers illustrated the real world effect of Seller's breach. At the same time, the loss of profits is of a character that defies exact proof. It is impossible for someone to determine *exactly* how many boxes of chocolates were not sold and will not be sold as a result of Seller's actions. However, the evidence at trial did establish that Buyer was substantially damaged by Seller's actions. By Dr. Oliver's calculations, Buyer would lose sales of approximately 2.711 million boxes over a three year period. When multiplied by Mr. Ward's testimony that Buyer makes $1.79 profit per box of chocolates sold, the total loss to Buyer, over only a three year period, would be $4,852,690. Buyer did have to produce evidence which established with reasonable certainty that Buyer was, in fact, damaged. *Coach House of Ward Parkway, Inc. v. Ward Parkway Shops, Inc.*, 471 S.W.2d 464, 468–71 (Mo.1971). However, given the nature of this substantial loss, it was reasonable for the trial court to require a lesser degree of certainty when proving the exact amount of its damages. There may be some element of uncertainty as to the amount of damages but "... not such uncertainty as to the fact, nature, existence, or cause of the damage as to render the testimony wholly lacking in probative value." *Id.* at 473. In the present case, the fact, existence, and cause of damage are clear, and both Oliver's and Ward's testimony had probative value. As is discussed in the following section, Oliver's testimony, was not too speculative and was based upon his expertise in the field of consumer satisfaction. Likewise, Tom Ward, who is president of both Buyer and Russell Stover Candies, is particularly familiar with both the candy business in general and Buyer's boxed chocolate sales. Ward testified that Buyer's annual sales were at $75 million in 1996. He also testified that Buyer has been "profitable," and that it makes $1.79 on every box of chocolates Buyer sells.

Oliver's testimony coupled with Mr. Ward's testimony provided the jury with sufficient evidence to calculate Buyer's damages with a reasonable degree of certainty. The fact that the amount of damages cannot be exactly determined does not preclude recovery. The jury was free to weigh all of the evidence presented on lost profits and make a determination as to the proper amount of damages, if any. In fact, the jury awarded a total of only $3 million on the lost profits claim, thus discounting Dr. Oliver's final figure by nearly $2 million. Even greater weight is given to the plaintiff's evidence on damages, when, as here, Seller made no effort to offer any alternative theory or evi-

dence on this issue. *Cole v. Control Data Corp.*, 947 F.2d 313, 319 (8th Cir.1991).

■ Seller next argues that it is indispensable for proof of anticipated profits that a plaintiff include the income and expenses of the business for a reasonable anterior period, with a consequent establishing of the net profits. However, it is evidence of net profits, not proof of income and expenses, that is essential to a claim of lost profits. As this court held in *All Star Amusement v. Jones*, 727 S.W.2d 930, 932 (Mo.App.1987), "[i]nsofar as All Star's evidence failed to establish anticipated net profits, the damage award cannot stand." In All Star, the evidence only established the amount of average gross revenues. *Id.* at 931. Seller argues that in making a claim for lost profits *Coonis v. Rogers*, 429 S.W.2d 709, 714 (Mo.1968), requires proof of income and expenses of the business for a reasonable time anterior to its interruption. *Id.* (citing *Fuchs v. Curran Carbonizing & Engineering Co.*, 279 S.W.2d 211, 219 (Mo.App.1955). However, the court in Coonis held that, "it is the *net* loss, not the gross, that must be established." In Coonis, the only proof of damages was a gross, rather than net, figure. The evidence of income and expenses serves as a means by which to establish the net profits. In the present case, Buyer's president testified as to the gross sales and the net profits. There was no need for Buyer to introduce other evidence of income and expenses to corroborate his net profit figure. Defense counsel was free to dispute the validity of Ward's testimony that Buyer makes $1.79 net profit per box of chocolate. Given the appropriate standard of review and the clear establishment of a substantial pecuniary loss to Buyer, there was sufficient evidence of net profits from which a jury could determine Buyer's lost profits.

■ Seller further argues that Ward's testimony regarding net profits is not the best evidence and that Buyer must provide documentary evidence to support its lost profits claim. However, the best evidence rule does not exclude evidence based on personal knowledge even if documents would

have provided the same information. *Cooley v. Dir. of Revenue*, 896 S.W.2d 468, 470 (Mo. banc 1995)(citing *Aluminum Prod. Ent. v. Fuhrmann Tooling*, 758 S.W.2d 119, 122 (Mo.App.1988)). In *Aluminum Prod. Ent. v. Fuhrmann Tooling*, the president of the plaintiff corporation testified regarding damages sustained from a breach of contract. *Aluminum Prod. Ent. v. Fuhrmann Tooling*, 758 S.W.2d at 122. The defendant in Aluminum Products argued on appeal that without the substantiating evidence of receipts and invoices, the jury could only have assessed the damages by reason of conjecture and speculation. *Id.* The court rejected this argument, stating that the president's testimony was based on his personal knowledge of the business operations. *Id.* In the present case, the testimonial evidence of Ward was sufficient to provide the jury with a rational basis for estimating lost profits, and the jury will determine the weight to be accorded such testimony. *Smith Moore v. J.L. Mason Realty Inv.*, 817 S.W.2d 530, 534 (Mo.App.1991). Point I is denied.

### Admission of Expert Testimony by Consumer Psychologist

Appellant Seller next argues that the trial court should have granted Seller a new trial because the trial court erred in admitting the testimony of Dr. Richard Oliver, a consumer psychologist. Seller claims the testimony was too speculative and that Oliver's methodology did not meet minimum standards of reliability, was not generally accepted by the scientific community, and did not satisfy RSMo. § 490.065.[5]

■ On appeal, the trial court's decision to admit expert testimony is reviewed for an abuse of discretion. *Rust v. Hammons*, 929 S.W.2d 834, 838 (Mo.App.1996). Under an abuse of discretion standard, this court will reverse the trial court's decision to admit Oliver's testimony only when the ruling is "so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State ex rel. Webster v. Lehndorff Geneva, Inc.*, 744 S.W.2d 801, 804 (Mo. banc 1988). If reasonable people might differ about the propriety of the

---

5. All statutory references are to RSMo.1994 un-          less otherwise indicated.

trial court's decision, then this court cannot say that an abuse of discretion occurred. *Id.*

■ Specifically, Seller makes three arguments. First, Seller argues that the plaintiff's expert testimony was so unreliable, when analyzed under the factors set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), that it should have been inadmissible. Seller contends that § 490.065 governs the admissibility of expert testimony, and that, because § 490.065 and Federal Rule of Evidence 702 are substantially identical, Daubert and its progeny are instructive. As this court mentioned in *Schumann v. Mo. Hwy. & Transp. Comm'n*, 912 S.W.2d 548, 554 n. 8 (Mo.App.1995), the Supreme Court of Missouri has yet to address whether § 490.065 supplants the *Frye* test in Missouri as the standard for admission of expert testimony.[6] Since the Supreme Court of Missouri's decision to adopt the *Frye* test in *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860 (Mo. banc 1993), and the Supreme Court's subsequent decision in *Lasky v. Union Electric Co.*, 936 S.W.2d 797 (Mo.1997) (directing the trial court on remand to follow § 490.065 in evaluating the admission of expert testimony), courts of Missouri have continued to follow the *Frye* standard in at least one case, *Bray v. Bi-State Dev. Corp.*, 949 S.W.2d 93, 98 (Mo.App. 1997). Because the expert testimony at issue in the case at bar satisfies the requirements of *both Frye* and *Daubert*, this court need not determine whether § 490.065 supersedes the *Frye* test in Missouri.

Daubert requires the trial court to consider four factors: (1) whether the theory can be objectively proven, (2) whether the expert's methodology has been subject to peer review, (3) the potential rate of error, and (4) whether the expert's work has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. On the other hand, the Frye decision only requires that the expert's testimony be based on scientific principles generally accepted in the scientific community, which is basically

the fourth prong of the Daubert test. *Frye v. U.S.*, 293 F. at 1014. A review of the record, with these factors in mind, indicates that consumer psychology has been studied extensively utilizing accepted research techniques, and is generally accepted by the scientific community, thus satisfying the test set out in Frye. In fact, a whole industry has built up around the field of consumer satisfaction. Oliver based his analysis of Buyer's lost sales on the principles derived from this "large body of research." He has published more than 100 articles and papers on various aspects of consumer psychology, has presented research papers on consumer satisfaction and dissatisfaction, and is the author of the leading textbook in the field of consumer satisfaction. He has also spent nearly 20 years serving on editorial review boards of the leading scientific journals in the field. Oliver testified that if another qualified researcher attempted to duplicate his results that their final numbers would probably not deviate by more than ten percent.

Although this court has not found an abundance of cases where consumer psychologists have been called as experts, the cases which have involved consumer psychologists have generally held their expert testimony to be admissible. *See Conoco, Inc. v. May Dept. Stores Co.*, 46 F.3d 1556, 1572 (Fed.Cir.Mo. 1994); *Barnes Group, Inc. v. Connell Ltd. Partnership*, 793 F.Supp. 1277, 1292 (D.Del. 1992); *Silver v. U.S. Postal Service*, 951 F.2d 1033, 1042 (9th Cir.1991). Upon review of the factors set out in Daubert, this court can not say that the expert testimony was so unreliable as to be inadmissible.

■ Second, Seller argues that even if the expert testimony was reliable it was too speculative and not based on knowledge. This argument is without merit. Dr. Oliver was called specifically because of his nearly 20 years of knowledge in the field of consumer psychology. It was his experience and knowledge that enabled him to draw his conclusions. Defense counsel was free to cross-examine the witness and question, among other things, his knowledge of consumer psy-

---

6. The traditional test originated in *Frye v. U.S.*, 293 F. 1013 (D.C.Cir.1924). In Frye, the court held that, in order to be admissible, an expert witness' testimony must be based on scientific principles that we generally accepted in the relevant scientific community. *Id.* at 1014.

chology. Defense counsel could also have called their own expert regarding the psychology of consumers, if they did not believe Oliver's calculations were accurate or that he did not have sufficient consumer knowledge.

■ Finally, Seller argues even if the testimony was reliable and not speculative that the testimony did not relate to any issue in the case. Seller argues in their brief that because Oliver's testimony primarily concerned lost sales, rather than lost profits, that "his testimony cannot prove the fact of *actual* lost profits, and ... is, at best, irrelevant ... and should have been excluded." While the majority of his testimony was directed at determining the amount of lost sales, he did testify as to lost profits. After determining what, in his opinion, was the amount of lost sales, he multiplied that number by Buyer's per box profit of $1.79 to come up with a lost profits figure. However, even if Oliver's testimony was, by itself, inconclusive on the subject of lost profits, that does not make it either inadmissible or devoid of probative value. *Khan v. State Oil, Co.*, 93 F.3d 1358, 1365 (7th Cir.1996). Under the applicable standard of review, this court finds that the trial court did not commit an abuse of discretion in allowing the expert testimony of Dr. Oliver. Point II is denied.

### Submissibility of Claim for Indemnification

In its third point on appeal, Seller argues that the trial court erred in submitting Buyer's claim for indemnification because Buyer: (1) failed to prove that any of the credits, for which it sought indemnification, were valid obligations; (2) failed to present the claims for indemnification within the one-year period; and (3) failed to prove that the claims exceeded the $400,000 deductible, as required by § 9.2(a) of the Agreement.

■ First, Seller argues that the credits were not "valid obligations" because they were not liabilities of Buyer. Seller relies on the proposition in *Hamiltonian Fed. Sav. & Loan Ass'n v. Reliance Ins. Co.*, 527 S.W.2d 440, 444 (Mo.App.1975), that a contract for indemnification against losses does not cover an indemnitee's losses that result from the payment of claims for which the indemnitee is not liable. However, the Hamiltonian decision is inapplicable to the present case because it concerned an indemnification blanket bond limited to "losses." *Id.* at 442. In the present case, the Agreement covered "losses" as well as "claims." Section 9.1 of the Agreement states that "Seller shall indemnify ... Buyer from ... any and all claims, demands, losses ... that Buyer shall ... have asserted against it." The Agreement specifically holds Seller liable for any and all claims that Buyer shall have asserted against it which arise, result from, or relate to any breach of the Agreement by Seller. This includes the credits that retailers took against Buyer's invoices as a result of Seller discontinuing its freshness policy.

■ Furthermore, Seller argues that if it is liable for any and all "claims," that it cannot be liable for these particular claims because Buyer did not provide competent evidence that the retailer credits were, in fact, legitimate obligations. Seller suggests that the credits may have been improper or fabricated by the retailers, and as such it cannot be held liable under the Agreement. The conduct of the parties suggests otherwise. The evidence established that for more than 14 months following the closing Seller routinely reimbursed Buyer for deductions that retailers had taken on Buyer's invoices for Seller's outdated candy. With regard to these reimbursements that Seller consistently paid for over one year, there was no evidence presented at trial that Seller ever required Buyer to prove that these retailer credits were "legitimate." The practical construction which the parties themselves place on the Agreement is of considerable significance in determining the meaning of the terms of the contract. *Baker v. Whitaker*, 887 S.W.2d 664, 670 (Mo.App.1994). Seller was liable under the Agreement to indemnify Buyer from such claims, and whether the credits were "legitimate" claims was a question for the jury. For these reasons, and after viewing the evidence in the light most favorable to the verdict, Seller's argument fails. *Refrigeration Industries, Inc. v. Nemmers*, 880 S.W.2d at 916.

Next, Seller argues that Buyer failed to present the claims for indemnification within the one-year period, as required by § 9.2(a) of the Agreement, or prove that the claims exceeded the $400,000 deductible, as required by § 9.2(c). Seller further claims that § 9.5 of the Agreement, which exempts certain claims and losses from the one-year requirement and the $400,000 deductible, does not apply to the retailer's invoice credits.[7] Specifically, Seller argues that § 9.5 does not apply to the credits because the credits were not "liabilities." Seller cites *Alexander v. Llewellyn*, 70 S.W.2d 115, 117 (Mo.App.1934), for the proposition that liabilities must be a "bona fide obligation." However, the Agreement, which takes precedence over defining such terms, states otherwise.

Section 9.5 of the Agreement states that losses[8] or payments relating to any "excluded liability"[9] are exempt from the requirements of § 9.2. Article I of the Agreement then defines "liabilities" as "*any* direct or indirect indebtedness, liability, *claim*, loss, damage, deficiency, obligation or responsibility, known or unknown, fixed or unfixed ... *contingent or otherwise.* ..." (emphasis added). As such, this court cannot say that the trial court erred in concluding that the retailer's invoice credits constituted "excluded liabilities" under the Agreement.

Under the appropriate standard of review for reviewing the submissibility of a case, where this court views the evidence in the light most favorable to the verdict, the trial court did not err in allowing the submission of the indemnity claim to the jury.

### Submissibility of Claim for Display Racks

Next, Seller argues that Buyer failed to make a submissible case for reim-

bursement for display racks that were not delivered because the Agreement expressly allowed Seller to dispose of the display racks in the ordinary course of business.

Specifically, Seller argues that Buyer did not make a submissible case because Buyer failed to introduce evidence that Seller disposed of the display racks other than in the ordinary course of business. Seller's argument fails for two reasons.

First, to make a submissible case, Buyer must present substantial evidence supporting each element of its claim. *Spring v. Kansas City Area Transp. Auth.*, 873 S.W.2d 224, 225 (Mo. banc 1994). The verdict director, which Seller did not object to, set out the elements necessary for a submissible case on this claim. It stated, in pertinent part,

[I]f you believe:

First, [Buyer] and [Seller] entered into an agreement whereby defendant agreed to deliver to plaintiff all of the display racks [Seller] had at its Philadelphia plant, and

Second, [Seller] failed to perform such agreement, and

Third, [Buyer] was thereby damaged.

Buyer submitted substantial evidence on each of the elements for this claim. Buyer had no obligation to hypothesize in its verdict director Seller's theory that Seller could dispose of the display racks in the ordinary course of business under Section 8.1 of the Agreement. *Executive Jet Management and Pilot Service, Inc. v. Scott*, 629 S.W.2d 598, 607–608 (Mo.App.1981). It is not necessary for Buyer to submit evidence as to an affirmative defense. *Peete v. Equitable Life Assurance Society of the U.S.*, 697 S.W.2d 232, 234 (Mo.App.1985). At trial, Seller had the opportunity to submit evidence, offer an alternative instruction, and/or argue to the jury that Seller had no responsibility to

---

**7.** Section 9.5 states, in pertinent part, that Buyer may make a claim for indemnification after the one-year period and notwithstanding the $400,000 deductible "with respect to ... [l]osses relating to or payments made by Buyer for any Excluded Liability."

**8.** "Losses" is defined in § 9.1 and includes "any and all claims ... that Buyer shall ... have asserted against it."

**9.** Section 2.4 defines "Excluded Liabilities" and includes, "any *liabilities* arising out of or relating to products or inventory manufactured or produced by Seller prior to, on or after the Closing Date" and "all *liabilities* of Seller arising out of or relating to the operations of the Business prior to expiration of the Reservation of Rights Period." (emphasis added).

transfer all of the display racks because of Section 8.1. Seller cannot now argue on appeal that Buyer's claim should not have been submitted when Seller failed to object to the verdict director and when there was substantial evidence at trial on each of the elements of the claim.

Second, Seller argues that the plain language of the Agreement precludes this claim, and that as a matter of law, Seller had no obligation to ship "all" of the display racks to Buyer. Seller's interpretation of the Agreement relies upon Sections 2.1, 4.7, and 8.1 of the Agreement, and Schedule 4.7.

Section 2.1 states that:

> Seller agrees to sell ... all Display racks ... all of which is set forth and described on Schedules 4.6 and 4.7 as the same may be modified in accordance with the terms of Section 8.1.

Section 4.7 provides:

> It is acknowledged and agreed by Seller and Buyer that Schedule 4.7 will be modified by Buyer after the Closing Date in accordance with the terms of Section 8.1 hereof.

Schedule 4.7 lists "Other Tangible Assets being purchased by the Buyer," and its list includes "all display racks."

As written, Section 2.1 states that Schedule 4.7 may be modified, meaning that modification is not required, and that if it is modified it must be done so in accordance with Section 8.1. Likewise, Section 4.7 merely requires any modification of Schedule 4.7 to be done in accordance with the terms of Section 8.1. Thus, it appears that the requirements of Section 8.1 dictate what Buyer must do regarding amendments to Schedule 4.7.

Section 8.1 provides that:

> After the Closing Date Buyer shall have the right to enter the Plant for the purpose of inspecting the Assets, preparing a detailed inventory of the Assets and making such additions, deletions and adjustments to ... Schedule 4.7 ... as Buyer shall require, and shall thereafter deliver such amended schedule ... to Seller. Buyer shall ... prepare such amended schedules ... and deliver the same to Seller within sixty (60) days after the Closing Date. Until such modification to ... Schedule 4.7 has been made by Buyer and delivered to Seller, Seller shall not sell ... or otherwise dispose of any assets in the Plant except in the ordinary course of business.

Seller claims that Section 8.1 *requires* Buyer to inspect the assets at the Plant after the closing. This court does not read Section 8.1 in that way. Section 8.1 gives Buyer "the right to enter the plant" to make any amendments to Schedule 4.7 if they so choose. Then, if Buyer decides to amend Schedule 4.7 it appears that Section 8.1 requires buyer to "thereafter" deliver the amended Schedule 4.7 to Seller within 60 days.

Seller would have this court believe that, in spite of the fact that both Section 2.1 and Schedule 4.7 indicate that Buyer is purchasing "all display racks" from Seller, the last sentence of Section 8.1 enables Seller to dispose of display racks in the ordinary course of business until an amended schedule is delivered to Seller. With regard to the display racks, there was nothing to amend. Buyer purchased "all" of the racks and there was no need for Buyer to make additions or adjustments to the schedule. To require an amended schedule regarding the display racks would have been redundant. As such, Buyer made a submissible case for the display racks. Point IV is denied.

### Award of Attorneys' Fees

Finally, Seller argues that the trial court's award of attorney fees to the Buyer must be set aside because the Buyer should not be the "successful or prevailing" party in this case. Section 10.1 of the Agreement provides that, "If any legal action ... is brought ... because of a breach ... in connection with any of the provisions of this Agreement, the successful or prevailing party ... shall be entitled to recover reasonable attorneys' fees." After review of the previous four points, Buyer remains the prevailing party in the case, and as such Seller's point is denied.

Judgment affirmed.

All concur.