**William HARVEY, Plaintiff/Respondent,**

v.

**TIMBER RESOURCES, INC., Defendant/Appellant.**

**No. ED 77494.**

Missouri Court of Appeals, Eastern District, Division Five.

Jan. 9, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 22, 2001.

Eric C. Harris, Park Hills, and co-counsel Clinton B. Roberts, Tom R. Burcham, III, Sonya D. Day, Farmington, for appellant.

Dennis E. McIntosh, Farmington, for respondent.

CRIST, Senior Judge.

This case involves the breach of contract action brought by William Harvey (Harvey) to recover for lost profits from a timber contract he had with Timber Resources, Inc. (Company). A jury found in Harvey's favor and awarded him damages in the amount of $115,000. Company appeals, raising nine points of error. We affirm.

In the light most favorable to the verdict, the evidence at trial showed the following: In 1989, Harvey began his own timber business. Harvey would contract with different entities, including the government, to clear all timber from their property. Harvey and a crew of his employees would remove all merchantable timber from the property, use a portable saw mill to cut the logs, and sort it into different grades of timber products. Harvey then sold the timber and paid the property owner a portion of the proceeds, the amount varying depending on the contract. After paying his employees and paying his expenses, Harvey would keep the remainder of the money for himself.

Company is a corporation formed by Bill Wolfe (Wolfe) and two other men. In the spring of 1992, Wolfe and Harvey negotiated a contract for Harvey to cut timber on a 913–acre tract of land owned by Company near Potosi, Missouri. Wolfe and Harvey knew each other because they both lived in the small community of Grandin, Missouri. Ultimately, Harvey and Wolfe, acting for Company, entered into a "Timber Sale Contract" on May 31, 1992. Under the terms of the contract, Harvey agreed to buy all merchantable timber on the 913–acre tract at the rate of $55.00 per thousand board feet, "[t]his amount of money to be paid weekly (Friday or Saturday morn.)." Harvey also agreed to cut and remove all the merchantable timber by May 31, 1994 (two years). The written contract stated that "$5,000 deposit was made, to be carried forward to the end of contract—which is cutting off 913 acres as described or 2 years, whichever comes first."

Harvey and his logging crew of seven people rented a mobile home in Potosi and began to remove timber from the 913–acre tract. They worked from June 1992 until the end of September 1992. During that time, Harvey removed about one-fourth of the timber on the property. Each week, Harvey made a payment to Company in accordance with the $55.00 per thousand board feet price. Harvey made a net profit of $37,336.62 for his work from June of 1992 to the end of September 1992.

In late September 1992, Harvey decided to move his crew from the Potosi site to another site near his home of Grandin, Missouri. He expected the weather to get bad and did not want to move his crew up there for one or two days of work a week. Harvey had a prior contract to remove

timber from 180 acres of government property near Grandin and chose to spend his winter months working on that contract (the "Stillhouse" contract). Under the Stillhouse contract, dated February 27, 1992, he had until September of 1993 to remove the timber from the government property. Harvey also needed to remove timber from another 40–acre site. Since he was not removing any timber from the 913–acre tract, he stopped making payment to Company. He anticipated returning to that property in the spring of 1993. Sometime around Christmas of 1992, Harvey told Wolfe that he would return to the property when the weather cleared and Wolfe voiced no objections.

On February 23, 1993, Harvey entered into another government contract to remove timber from the Mark Twain National Forest. Under that contract, Harvey had until March 31, 1995 to remove timber from 86 acres there (the "Three Springs" contract). In April of 1993, Harvey began to make plans to return to the Potosi area and finish clearing the 913–acre tract. He told a mutual friend of his and Wolfe of his plans. The mutual friend, Joe Shields, told Harvey that he better talk to Wolfe before he went back to Potosi. Harvey talked with his uncle, Mick Harvey, who also had a timber contract with Company. Mick Harvey also told Harvey he should talk with Wolfe before returning to Potosi.

Harvey talked with Wolfe, who told him not to return to Potosi because he had breached the contract by moving off the property in September of 1992. Harvey went home and read the contract and then called Wolfe again. Wolfe then told him that he could not return to the Potosi property unless he wanted to pay them a higher percentage of money. Harvey asked Wolfe what would happen if he returned to the Potosi property, and Wolfe told him that they would get a court order to keep him out. Harvey asked the Company for the return of his $5,000 deposit and they offered to return only $2,500.

Harvey never returned to the Potosi property. On May 18, 1993, Harvey entered into another contract to remove timber from 389 acres for the U.S. Department of Agriculture (the "Miller Creek" contract). Under the "Miller Creek" contract, Harvey had until March 31, 1996 to finish clearing the timber. On March 1, 1994, Harvey filed this suit against Company for breach of contract, seeking lost profits from the contract of $270,000.

In September of 1995, Company contracted with Richard Cassinger to remove the remaining timber from the 913–acre tract in Potosi. Cassinger removed the remaining timber from the property in 1996. At trial, Harvey called an expert witness, John Crouch, a certified public accountant, to testify about his lost profits from the contract. Crouch used the gross revenue figures from Cassinger's contract and adjusted them to the 1993 price levels using *Missouri Timber Price Trends,* a publication of the Missouri Department of Conservation. Crouch testified that Harvey would have received gross revenue of $335,120 had he sold the remaining timber on the Potosi property under the terms of his contract. Crouch calculated Harvey's expected expenses to complete the contract by relying on Harvey's actual expenses during 1992 when he worked on the contract. Crouch then deducted Harvey's expected costs and expenses from this gross revenue figure and concluded Harvey would have had a net profit of $109,720 on the contract with Company. Crouch did not include the $5,000 deposit Harvey made with Company.

After trial, the jury found in favor of Harvey and awarded him $115,000 in damages. Company now appeals, alleging nine points of error. We consider three of Company's points and deny the remaining points pursuant to Rule 84.16(b).

■ In Point I, Company contends the trial court erred in allowing Harvey's expert to testify as to Harvey's anticipated lost profits because he failed to establish

his net profits or his fixed and actual expenses for a reasonable anterior period.

Company cites *Coonis v. Rogers,* 429 S.W.2d 709 (Mo.1968), to support its contention that Harvey must have shown proof of his income and expense for a reasonable anterior period before he could recover his lost profits. However, *Coonis* concerns the standard of proof for loss of expected profits after destruction of or injury to business, rather than loss of profits directly flowing from a breach of contract.

In *Coonis,* the owners of two competing trash collection businesses brought tort actions against each other in multiple counts. *Id.* One count alleged the party had interfered with the other party's business by enticing its customers to cancel their trash collection contracts with the business. *Id.* at 712. Under that count, the party sought loss of business profits as damages. *Id.* at 713–14. In analyzing this claim, the Missouri Supreme Court stated that loss of profits from "the interruption of an established business" may be recovered where reasonably certain proof shows the amount of those profits and "proof of the income and expenses of the business for a reasonable time anterior to its interruption, with a consequent establishing of the net profits during the previous period, is indispensable." *Id.* at 714.

The reasoning in *Coonis* has been applied to similar cases concerning injury to a business. *See also, Gesellschaft Fur Geratebau v. GFG America Gas Detection, Ltd.,* 967 S.W.2d 144, 147 (Mo.App. E.D. 1998) (distributor of products sued supplier for lost profits resulting from tortious interference with business and customer relationships); *Meridian Enterprises Corp. v. KCBS, Inc.,* 910 S.W.2d 329, 331–32 (Mo.App. E.D.1995) (corporation sued competitors for lost profits resulting from tortious interference with business relationship). In these types of cases, it is reasonable to require the plaintiff to prove past profits to show how the defendant's injury to the business affected its profits.

However, this same reasoning is inapplicable to the situation where a party seeks recovery for loss of profits directly flowing from a breach of contract, where the damages are readily ascertainable. *See, Sides v. Contemporary Homes, Inc.,* 311 S.W.2d 117, 121 (Mo.App.1958).

Company also refers to *Orchard Container Corp. v. Orchard,* 601 S.W.2d 299 (Mo.App. E.D.1980) as proof that a plaintiff must provide evidence of the income and expenses of the business for a reasonable time anterior even in a breach of contract action. However, in that case, a corporation sued its former president for breach of a noncompete covenant and the jury awarded the corporation damages of $61,273 based on profits the corporation lost when the former president opened a competing business. *Id.* at 305. While the case does involve a breach of contract action, it is not a case where the corporation sought recovery for loss of profit on the contract itself. Instead, the corporation sought lost profits because of the defendant's injury to its business after he breached a noncompete clause. As noted above, in such a case, there is a reason to require proof of income and expenses for a reasonable time anterior to the injury to the business.

■■■ In actions on contract, where the breach alleged consists of prevention of performance, the party not in default may generally recover the profits which would have resulted to him from performance, provided the loss is "ascertainable with reasonable certainty naturally and proximately results from the breach and the profits claimed are not speculative or conjectural and were within the contemplation of the parties when the contract was made." 25 C.J.S. *Damages* § 43 (1966). Further, "it is evidence of net profits, not proof of income and expenses, that is essential to a claim of lost profits." *Whitman's Candies, Inc. v. Pet Inc.,* 974 S.W.2d 519, 527 (Mo.App. W.D.1998). If there is sufficient evidence of net profits,

there is no need to introduce evidence of income and expenses. *Id.*

 Here, the expert testimony provided sufficient evidence of probable net profits Harvey would have made from the contract. The expert calculated Harvey's expected gross revenue if Harvey had completed the contract. The expert also considered Harvey's expected expenses to complete the contract and concluded Harvey had lost net profits of about $109,720. Harvey was not required to present evidence of his income and expenses for a reasonable anterior period to the breach by Company. Point I is denied.

 In Point II, Company argues the trial court erred in allowing Harvey's expert to testify about lost profits because he failed to consider Harvey's mitigation of damages in his calculations of lost profits.

After Company repudiated its contract, Harvey entered into the "Miller Creek" contract to remove timber from 389 acres for the U.S. Department of Agriculture. Company asserts Harvey's expert failed to consider how much profit Harvey made from this contract in calculating Harvey's damages. Company cites the *Restatement (Second) of Contracts* § 350 to support its assertion. Under subsection (1), a party may not recover damages the party "could have avoided without undue risk, burden or humiliation."

 Generally, one damaged by breach of contract must make reasonable efforts to minimize his damages. *A.G. Edwards & Sons, Inc. v. Drew*, 978 S.W.2d 386, 391 (Mo.App. E.D.1998). However, Company's assertion must fail because the evidence showed that the "Miller Creek" contract did not minimize Harvey's damages from Company's breach.

Under the "Miller Creek" contract, Harvey had from May 18, 1993 until March 31, 1996, nearly three years, to remove the timber from the 389 acres. This time period gave Harvey almost two years after the expiration of his contract with Company to clear only 389 acres. Harvey's con-

tract with Company gave him until May 31, 1994 to remove all the timber from the Potosi property. Certainly, Harvey could have removed the timber from the Potosi property by May 31, 1994, and then taken the next 22 months to clear the 389 acres under the "Miller Creek" contract. Harvey himself testified that he could have performed the "Miller Creek" contract as well as his contract with Company. He stated that it would not have been difficult to fulfill his obligations to Company as well as the obligations on the Miller Creek contract, although that would have "crowded things."

As such, the evidence showed Harvey could have completed both contracts and could not have avoided the loss associated with Company's breach. *See, Restatement (Second) of Contracts* § 350 illustration 10; 22 Am.Jur.2d *Damages* § 509 (1988). Company offered no other evidence that Harvey had any other opportunity to mitigate and thus, failed in its burden of proof. *Braun v. Lorenz*, 585 S.W.2d 102, 108 (Mo. App. W.D.1979). Point II is denied.

 In Point VI, Company argues the trial court erred in denying his motion for judgment notwithstanding the verdict and motion for new trial because Harvey's damages calculations were not reasonably certain where they contained costs and profit figures for contracts other than the one between Company and Harvey. Specifically, Company points to Harvey's testimony that he also cut timber for Tom Jarvis in 1992 while he was working on Company's contract.

 Damages are not recoverable for loss beyond an amount that the evidence establishes with reasonable certainty, but not absolute certainty. *Scullin Steel Company v. PACCAR, Inc.*, 708 S.W.2d 756, 761 (Mo.App. E.D.1986). However, "certainty" means that damages have been suffered and not exact proof of the amount of the damages. *City of Kennett v. Katz Const. Co.*, 273 Mo. 279, 202 S.W. 558, 562 (1918). Where the fact of

damage is clear, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual supervisory power of the court. *Aluminum Products Enterprises, Inc. v. Fuhrmann Tooling and Mfg. Co.*, 758 S.W.2d 119, 121 (Mo.App. E.D.1988); *See also, Whitman's Candies*, 974 S.W.2d at 526.

There is nothing to indicate that the expert considered any income or expenses from the Jarvis property in his estimation of damages. The expert testified extensively that he considered only receipts from the sale of timber from Company's property and his assessment of the cost of production reflected only the expenses attributable to the 913–acre tract. While Harvey did say he worked on the Jarvis tract during this same time period, there is no evidence to show Harvey's expert considered any revenue or expenses from that tract.

Here, the fact of damage was clear, but the amount of the loss in dispute. The amount of damages is a matter for the jury to decide. *Emery v. Wal-Mart Stores, Inc.*, 976 S.W.2d 439, 448 (Mo. banc 1998). The jury was free to weigh all the evidence presented on lost profits, including any possibility the figures might contain expenses for other work, and make a determination of the proper amount of damages. Obviously, the jury believed the expert's figures included only expenses for the Company's property. Point denied.

Company's remaining points have no merit. In Points III & IV, Company asserts the trial court erred in allowing Harvey's expert to testify based on the *Missouri Timber Price Trends* and in admitting them into evidence because the manuals are hearsay and he failed to show they are reasonably relied on by experts in the field. In Point V, Company argues the trial court erred in allowing Harvey to testify about statements made to him by Mick Harvey and Joe Shields because the statements are inadmissible hearsay. In Point VII, Company contends the court erred in denying his motion for directed verdict because Harvey failed to make a submissible case because he failed to testify that he did not know when he would have been able to complete his obligation. In Point VIII, Company contends the trial court erred in admitting Exhibit 9 into evidence because the measure of damages was inaccurate and contained a $15,000 error. Company has failed to file a copy of Exhibit 9 with this court. In Point IX, Company argues the trial court erred in submitting Instruction No. 6 to the jury based on MAI 26.06 because it asked the jury to decide facts that were not in dispute. We have reviewed the briefs of the parties and the record on appeal and conclude there is no error of law. An extended opinion discussing these issues would have no precedential value and we decline to discuss them further. Rule 84.16(b). All points are denied.

The judgment is affirmed.

MARY K. HOFF, C.J., and KATHIANNE KNAUP CRANE, J., concur.