

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| AMERICAN EAGLE WASTE INDUSTRIES, LLC, MERIDIAN WASTE SERVICES, LLC, and WASTE MANAGEMENT OF MISSOURI, INC., | ) ) ) ) ) | No. ED101373 |
| | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| Respondents/Cross-Appellants, | ) | 08SL-CC02198-02 |
| | ) | |
| vs. | ) | |
| | ) | Honorable Barbara W. Wallace |
| ST. LOUIS COUNTY, MISSOURI, | ) | |
| | ) | |
| Appellant/Cross-Respondent. | ) | Filed: February 24, 2015 |

St. Louis County, Missouri ("the County") appeals the trial court's judgment awarding American Eagle Waste Industries, LLC ("American Eagle"), Meridian Waste Services, LLC ("Meridian"), and Waste Management of Missouri, Inc. ("Waste Management") (collectively "Haulers") damages on their declaratory judgment claim arising out of the County's liability for violating section 260.247 RSMo Supp. 2008.[1] Section 260.247 required the County to give Haulers two-year notice by certified mail before the County commenced its own trash collection services. *State ex rel. American Eagle Waste Industries v. St. Louis County*, 272 S.W.3d 336, 341-44 (Mo. App. E.D. 2008); sections 260.247.1 and .2. In deciding a previous appeal involving the County and Haulers, the Missouri Supreme Court held that the County was liable

---

[1] All further statutory references to section 260.247 are to RSMo Supp. 2008, which incorporates legislative amendments through 2007.

to Haulers for violating section 260.247, set forth the standard for measuring Haulers' damages, and remanded the cause to the trial court for both parties to engage in discovery, present evidence, and cross-examine witnesses with respect to the amount of damages Haulers were entitled. *American Eagle Waste Industries, LLC v. St. Louis County*, 379 S.W.3d 813, 831-33 (Mo. banc 2012). Upon remand, the trial court held a bench trial and entered the judgment at issue in the instant case awarding American Eagle $593,489.00 in damages, Meridian $384,486.00 in damages, and Waste Management $4,944,790.00 in damages. The County appeals the award of damages and Haulers cross-appeal the calculation of damages. We affirm the trial court's judgment in all respects.

## I. BACKGROUND

### A. The Procedural History

This case has a lengthy procedural history. Prior to December 2006, Haulers, a group of private trash and waste collectors, provided trash and waste collection ("trash collection") services to residents of unincorporated St. Louis County. On December 12, 2006, the St. Louis County Council enacted an ordinance creating significant changes in the regulation of trash collection in unincorporated areas, enabling the County to establish trash collection districts and begin trash collection responsibilities. The County requested bids to contract with trash collection companies for each newly-established trash collection district, and each Hauler submitted at least one bid.

In June 2007, before the County had accepted any bids, the Missouri General Assembly amended section 260.247, effective January 1, 2008, to impose requirements on political subdivisions. The amendment provides, *inter alia*, that in the event a political subdivision commences its own trash collection services, the political subdivision must give companies

currently providing trash collection services two-year notice by certified mail before the political subdivision may commence such services. Sections 260.247.1 and .2.

1.      **Haulers' Declaratory Judgment Claim and *American Eagle I***

Following the 2007 amendment to section 260.247, the County continued with the implementation of its new trash collection program and did not award Haulers any of the contracts for trash collection. On May 29, 2008, Haulers filed a petition seeking a declaratory judgment that the County's plan to contract with the trash companies submitting the winning bids violated section 260.247. The County filed a motion to dismiss Haulers' declaratory judgment claim for failure to state a claim on which relief could be granted. The County's motion to dismiss asserted that section 260.247 could not be constitutionally applied to the County because its status as a charter county allows it to regulate municipal functions including trash collection. The trial court granted the County's motion to dismiss, and Haulers appealed.

On appeal, this Court reversed the dismissal of Haulers' declaratory judgment claim and remanded the cause to the trial court for further proceedings. *State ex rel. American Eagle Waste Industries v. St. Louis County*, 272 S.W.3d 336, 339-44 (Mo. App. E.D. 2008) ("*American Eagle I*"). To give guidance to the trial court on remand, our Court addressed the merits of Haulers' declaratory judgment claim. *Id*. at 341-44. We held that section 260.247 applied to the County, despite its charter status, because it involves the state-wide public policy to "provide an entity engaged in [trash] collecting with sufficient notice to make necessary business adjustments prior to having its services terminated in a given area." *Id*. at 341-42 (quotations omitted). Accordingly, we also held the County must comply with the two-year notice provision set forth in section 260.247 if the County chose to enter the business of trash collection and take it out of the hands of existing private collectors. *Id*. at 343.

3

### 2.    The First Trial and *American Eagle II*

On remand, Haulers filed an amended petition and added a claim for breach of implied contract, seeking monetary damages for the County's failure to comply with section 260.247. In September 2010, the trial court entered summary judgment in Haulers' favor on the issue of liability.

On May 31, 2011, the trial court held a bench trial and heard evidence of Haulers' damages ("the first trial"). Haulers presented testimony from expert witness C. Eric Ficken, who was a certified public accountant, a certified valuation analyst, and certified in financial forensics. Ficken's opinion as to Haulers' damages was based on unaudited records provided to him by Haulers, and the County objected to Ficken's testimony on the grounds that it lacked foundation and constituted inadmissible hearsay. The trial court overruled the County's objections. After the conclusion of the first trial, the trial court entered a judgment collectively awarding Haulers $1.2 million in damages, finding that the correct measure of damages was the amount of net profit Haulers would have realized during the relevant two-year waiting period.

The County appealed the trial court's judgment to the Missouri Supreme Court,[2] and Haulers cross-appealed. *American Eagle Waste Industries, LLC v. St. Louis County*, 379 S.W.3d 813, 823 (Mo. banc 2012) ("*American Eagle II* "). Each party raised two arguments which are relevant to this appeal. As the County previously asserted in its motion to dismiss Haulers' declaratory judgment claim, the County argued to the Missouri Supreme Court that section 260.247 does not apply to the County because its status as a charter county allows it to regulate municipal functions including trash collection. *Id*. at 823, 824. The County also argued to the Missouri Supreme Court that the trial court erred in finding the County liable to Haulers on the

---

[2] The County directly appealed the trial court's judgment to the Missouri Supreme Court, by filing a notice of appeal alleging the case involved the validity of a statute or a provision of the Missouri Constitution.

4

theory of breach of implied contract. *Id*. at 824. Finally, Haulers argued to the Supreme Court that the trial court erred in its measurement and calculation of damages. *Id*.

### a. The Applicability of Section 260.247

The Missouri Supreme Court declined to consider the merits of the County's claim that section 260.247 does not apply to the County. *Id*. at 824-25. Instead, the Supreme Court quoted this Court's decision in *American Eagle I*, found that the "[t]he court of appeals previously considered th[e] argument on the merits and discussed the proper interpretation of section 260.247 at length before rejecting [the] County's position," and found there was "no demonstrable error in the first appellate decision." *Id*. Accordingly, the Supreme Court held that "it is the law of the case that [the] County was required to adhere to section 260.247's requirements" and "[the] County cannot have multiple bites at the apple in attempting to determine this issue favorably." *Id*. at 825.

### b. The County's Liability

With respect to the County's other argument, the Missouri Supreme Court agreed with the County that the trial court erred in finding the County liable to the Haulers on the theory of breach of implied contract. *Id*. at 829, 831. Nevertheless, the Supreme Court found that the trial court "still reached the correct result in finding [the] County liable" and affirmed the trial court's judgment as to liability. *Id*. at 831. The Court reasoned that, (1) the facts of Haulers' amended petition adequately alleged a claim for an implied private right of action for violating a statute, section 260.247; (2) a private right of action is created in favor of Haulers under section 260.247; (3) "[t]he legislature intended for Haulers to provide service and receive their contract price for two-years following notice [from the County]"; and (4) "the legislature intended a right to damages in this situation." *Id*. at 829-831.

5

### c.  The Measurement and Calculation of Damages

In addressing Haulers' arguments on cross-appeal that the trial court erred in its measurement of damages and its calculation of damages, the Supreme Court first determined Haulers' rights and obligations under section 260.247. *Id*. at 824, 831-32. The Court found that pursuant to the language in subsections 1, 2, and 3 to section 260.247, "Haulers were *entitled* to continue providing [trash] collection services for two years" and "Haulers have the right to seek damages from [the] County for the violation of section 260.247." *Id*. at 832 (emphasis in original).

In determining the appropriate measure of damages, the Supreme Court held that "[the] County must pay Haulers that to which they were entitled: the amount they 'would have received' under their contract during the two-year[3] waiting period." *Id*. (quoting section 260.247.3). The Supreme Court specifically found Haulers were entitled to "their projected receipts from their contract price [for their services], minus any business and operational costs Haulers would have incurred while providing [trash] collection services, considering all the circumstances." *Id*. at 833. In other words, Haulers were entitled to the net profit they would have received during the two-year waiting period, i.e., the "expected revenue, set off by expenses, costs, and other circumstances." *Id*. at 833, 834. Stated yet another way, Haulers were entitled to damages for lost business profits. *See id*. at 833 (citing *Ameristar Jet Charter, Inc. v. Dodson Intern. Parts, Inc.*, 155 S.W.3d 50, 55 (Mo. banc 2005)).

The Supreme Court also held that while the trial court correctly concluded that the measure of Haulers' damages was the amount of net profit Haulers would have realized during

---

[3] The Supreme Court held the two-year waiting period began April 8, 2008 for trash collection district three and on June 10 and 17, 2008 for the other trash collection districts, and the period ended two years after those respective dates. *American Eagle II*, 379 S.W.3d at 834. All further references to the "two-year waiting period" will refer to this time frame.

6

the two-year waiting period, the trial court erred excluding discovery or evidence of Haulers' expenses or net profit. *American Eagle II*, 379 S.W.3d at 833. Therefore, the Supreme Court reversed the trial court's calculation of damages and remanded the cause to the trial court for both parties to engage in discovery, present further evidence, and cross-examine witnesses with respect to the correct amount of damages Haulers were entitled, which brings us to the instant case. *Id*. at 833, 835.

**B.     The Instant Case**

Upon remand from the Missouri Supreme Court, the trial court held a second bench trial on damages which took place on August 12, 2013. The County did not present any witnesses or other evidence. However, as in the first trial, Haulers presented the expert testimony of C. Eric Ficken. Ficken testified as his opinion of Haulers' damages for lost profits, and the trial court allowed Haulers to incorporate Ficken's testimony in the first trial as evidence in the second trial. Ficken's opinion as to each Hauler's lost profits for the two-year waiting period was based on information provided to him by Haulers, specifically Haulers' databases of customers and Haulers' unaudited profit and loss statements from 2006 through 2010. Once again, the County objected to Ficken's testimony on the grounds that it lacked foundation and constituted inadmissible hearsay, and the trial court overruled the County's objections.

Ficken testified that, due to the County's failure to comply with the two-year waiting period set forth in section 260.247, American Eagle suffered lost profits in the amount of approximately $1.49 million, Meridian suffered lost profits in the amount of approximately $771,200.00, and Waste Management suffered lost profits in the amount of approximately $7.87 million. Ficken's assessment of lost profits included damages for growth, rate increases, disposal fees, uncollectible accounts receivable, and layoff costs.

7

Subsequently, the trial court entered a judgment in favor of Haulers. The trial court found that Ficken was qualified as an expert witness to testify as to Haulers' damages on the basis of his knowledge, experience, and education. The trial court rejected the portion of Ficken's opinion which included damages for growth, rate increases, disposal fees, uncollectible accounts receivable, and layoff costs in his assessment of lost profits, finding that those categories of damages were too speculative or were otherwise inappropriate for the calculation of damages. However, the trial court found that Ficken otherwise appropriately calculated the lost profits of each Hauler by calculating lost revenue based upon the number of customers each Hauler lost in the two-year waiting period and then deducting the overhead expenses tied to the production of that revenue. The trial court also found that the facts and data relied on by Ficken were of a type reasonably relied upon by experts in the field and that the facts and data were otherwise reasonably reliable.

The trial court's judgment awarded American Eagle $593,489.00 in damages, Meridian $384,486.00 in damages, and Waste Management $4,944,790.00 in damages. After the trial court entered its judgment, Haulers filed a motion to amend the judgment, which the trial court denied. The County appeals, and Haulers cross-appeal.

## II.      DISCUSSION

The County raises three points on appeal, claiming the trial court erred in awarding Haulers damages. Haulers present one point on cross-appeal, arguing the trial court's calculation of damages was erroneous.

### A.      General Standard of Review

In reviewing a court-tried case, our Court will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it

8

erroneously declares or applies the law. *Scheck Indus. Corp. v. Tarlton Corp.*, 435 S.W.3d 705, 717 (Mo. App. E.D. 2014). We view the evidence and all reasonable inferences therefrom in the light most favorable to the judgment, and we disregard all contrary evidence and inferences. *Id*.

An appellate court presumes the trial court's judgment is valid, and the burden is on the complaining party to demonstrate it is incorrect. *Id*. "The trial court's findings as to damages are entitled great weight and this Court will not disturb these findings unless the damages awarded are clearly wrong, could not have been reasonably determined, or were excessive." *Id*. at 731 (quotations omitted). Moreover, we defer to the trial court's decision even if the evidence could support a different conclusion. *King v. Bullard*, 257 S.W.3d 175, 182 (Mo. App. E.D. 2008). We also defer to the trial court's credibility determinations and factual findings. *Scheck*, 435 S.W.3d at 717; *Federal Nat. Mortg. Ass'n. v. Wilson*, 409 S.W.3d 490, 494 (Mo. App. E.D. 2013). However, the trial court's conclusions of law are reviewed *de novo*. *Federal Nat. Mortg. Ass'n.*, 409 S.W.3d at 494.

**B.      The County's Appeal**

The County raises three points on appeal. In its first point, the County argues the trial court's award of damages is not supported by substantial evidence. In its second point, the County argues that the trial court's award of damages is against the weight of the evidence. Finally, in its third point, the County argues that the trial court erred in awarding Haulers damages because Haulers failed to state a claim for which relief could be granted.

**1.      The Trial Court's Award of Damages is Supported by Substantial Evidence**

In the County's first point on appeal, it asserts the trial court's award of damages for lost profits is not supported by substantial evidence. We disagree.

9

"In evaluating the sufficiency of evidence to sustain awards of damages for loss of business profits the appellate courts of this state have made stringent requirements, refusing to permit speculation as to probable or expected profits, and requiring a substantial basis for such awards." *Ameristar*, 155 S.W.3d at 54 (quotations omitted). In order to receive an award of damages for lost profits, a plaintiff must set forth evidence which provides an adequate basis for estimating the lost profits with reasonable certainty. *Id*.

However, lost profits determinations do not operate as an exact science. *Gateway Foam Insulators, Inc. v. Jokerst Paving & Contracting, Inc.*, 279 S.W.3d 179, 186 (Mo. banc 2009). Accordingly, although an estimate of prospective or anticipated net profits must be based upon more than mere speculation, uncertainty as to the amount of profits that would have been made by the plaintiff does not prevent a recovery. *Ameristar*, 155 S.W.3d at 54-55. While a plaintiff must prove the existence of damages within reasonable certainty, it is not always possible to establish the amount of damages within the same degree of certainty. *Id*. at 55. If the evidence in a case involving lost profits demonstrates that a party had a substantial pecuniary loss, but it is apparent that the loss is of a character which defies exact proof, a lesser degree of certainty as to the amount of the loss is required, leaving a greater degree of discretion to the finder of fact as to the amount of damages to be awarded. *Id*.

In this case, the trial court's award of damages for lost profits was based on Ficken's expert testimony. The County advances four main arguments as to why the trial court's award of damages for lost profits is not supported by substantial evidence: (1) Haulers presented no proof of their past profits and expenses; (2) Haulers presented no proof that they had contracts with the customers they lost as a result of the County's violation of section 260.247; (3) Ficken's opinion as to Haulers' damages for lost profits was based on facts and data he received from Haulers and

10

of which he had no first-hand knowledge; and (4) Ficken's methodology in calculating the County's lost profits was flawed.

### a. Whether Haulers Were Required to Prove Past Profits and Expenses

The County first argues that the trial court's award of damages for lost profits is not supported by substantial evidence because Haulers presented no proof of their past profits and expenses. This argument is premised upon the County's proposition that Haulers were required to show proof of past profits and expenses in order to recover damages for lost profits. As explained below, whether a plaintiff-business must prove past profits and expenses in order to recover damages for lost profits depends on the exact nature of the underlying cause of action. *See BMK Corp. v. Clayton Corp.*, 226 S.W.3d 179, 195-96 (Mo. App. E.D. 2007) (finding that proof of past profits and expenses is required in some cases but not in others).

Missouri Courts have held that proof of past profits and expenses is necessary to recover damages for lost profits where lost profits are being sought from the interruption of an established business and the underlying cause of action is based upon a tort or tortious interference claim. *See, e.g.*, *Coonis v. Rodgers*, 429 S.W.2d 709, 712-14 (Mo. 1968) (interruption of established business and tort claim for interference with a contractual relationship); *Midwest Coal, LLC ex rel. Stanton v. Cabanas*, 378 S.W.3d 367, 368-73 (Mo. App. E.D. 2012) (interruption of established business and tort claim for fraudulent misrepresentation); *Gesellschaft Fur Geratebau v. GFG America Gas Detection, Ltd.*, 967 S.W.2d 144, 146-47 (Mo. App. E.D. 1998) (interruption of established business and claim for tortious interference with business contracts and relationships). Appellate courts of this state have also held that proof of past profits and expenses is necessary to recover damages for lost profits in breach of contract actions where profits are not readily calculable and the plaintiff is

11

not seeking lost profits on the contract itself. *EnerJex Resources, Inc. v. Haughey*¸ 2014 WL 6679302 at *5 (Mo. App. W.D. 2014); *see also Orchard Container Corp. v. Orchard*, 601 S.W.2d 299, 301, 302, 305-06 (Mo. App. E.D. 1980) (proof of past profits and expenses necessary to recover lost profits where plaintiff-business sued a former officer for breach of a non-compete agreement and plaintiff sought profits lost as a result of the former officer working for a competing business).

In contrast, Missouri Courts have held it is not necessary for a plaintiff-business to prove past profits and expenses where the plaintiff seeks to recover damages for lost profits flowing directly from a breach of or interference with a specific contract or transaction. *Midwest Coal*, 378 S.W.3d at 371 (citing *BMK Corp.*, 226 S.W.3d 179, *Harvey v. Timber Resources, Inc.*, 37 S.W.3d 814 (Mo. App. E.D. 2001), and *Hanes v. Twin Gable Farm, Inc.*, 714 S.W.2d 667 (Mo. App. W.D. 1986)). The specific contract at issue in *BMK* provided defendant would sell foam products to plaintiff, and defendant breached that contract by terminating it and selling its products directly to plaintiff's customers. 226 S.W.3d at 184-87. In *Harvey*, the specific contract at issue involved plaintiff's purchase and removal of defendant's timber, and defendant breached the contract by telling plaintiff he could not finish removing the timber. 37 S.W.3d at 816, 817. And the specific transaction at issue in *Hanes* involved defendant's sale of a bull to plaintiff, and defendant interfered with the transaction by fraudulently misrepresenting to plaintiff that the bull was capable of breeding when in fact he was sterile. 714 S.W.2d at 668. In those three cases, "[the] claims for lost profits involved known commodities with demonstrable market prices," and proof of past profits and expenses was not required because plaintiffs clearly established the fact of damages and plaintiffs could estimate the amount of damages with

12

reasonable certainty.  *Midwest Coal*, 378 S.W.3d at 371, 372 (describing the holdings in *BMK*, 226 S.W.3d at 195-96, *Harvey*, 37 S.W.3d at 818, and *Hanes*, 714 S.W.2d at 669-70).

In this case, we consider an issue of first impression: whether proof of past profits and expenses is required where, as here, the underlying cause of action seeks damages for lost profits from a defendant based upon an implied right of action for violating a statute.  Based on the absence of such a requirement in *American Eagle II*, as well as the similarities between Haulers and the plaintiffs in *BMK*, *Harvey*, and *Hanes*, we hold that it was not necessary for Haulers to prove its past profits and expenses in order to recover damages for lost profits from the County based upon an implied right of action for the County's violation of section 260.247.

In *American Eagle II*, the Supreme Court gave specific directions to the trial court in calculating the appropriate measure of damages for Haulers' lost profits upon remand.  379 S.W.3d at 831-34.  The Supreme Court found that "[the] County must pay Haulers that to which they were entitled: the amount they 'would have received' under their contract during the two-year waiting period."  *Id*. at 832 (quoting section 260.247.3).  The Court also found Haulers were specifically entitled to "their projected receipts from their contract price [for their services], minus any business and operational costs Haulers would have incurred while providing [trash] collection services, considering all the circumstances."  *Id*. at 833.  In other words, the Supreme Court provided that Haulers were entitled to the net profit they would have received during the two-year waiting period, i.e., the "expected revenue, set off by expenses, costs, and other circumstances."  *Id*. at 833, 834.  Noticeably absent from the Supreme Court's decision in *American Eagle II* is any requirement that Haulers prove its past profits and expenses in order to recover damages for lost profits.

In addition, although Haulers' claim of damages for lost profits arguably arises out of the interruption of established businesses, it does not does not arise out of a tort claim, a tortious interference claim, or a breach of contract claim. Instead, Haulers' claim for lost profits arises directly out of the County's failure to comply with the two-year waiting period set forth in section 260.247. Like the plaintiffs in *BMK*, *Harvey*, and *Hanes*, who sought to recover damages for lost profits flowing directly from a breach of or interference with a specific contract or transaction, Haulers seek to recover damages for lost profits flowing directly from the County's violation of a *specific statute*, section 260.247. Additionally, like the plaintiffs in *BMK*, *Harvey*, and *Hanes*, whose claims for lost profits involved known commodities with demonstrable market prices, Haulers' claim involves a known service (trash collection) with a demonstrable market price (Ficken testified that his calculation of lost profits was based upon, *inter alia*, the monthly rate paid by each of Haulers' lost customers). Moreover, as discussed below in Section II.B.1.e., like the plaintiffs in *BMK*, *Harvey*, and *Hanes*, Haulers established the fact of damages and an estimate of the amount of damages with reasonable certainty.

Based on the foregoing, Haulers were not required to prove past profits and expenses.

### b. Whether Haulers Were Required to Prove They had Contracts with Their Lost Customers

Next, the County argues that the trial court's award of damages for lost profits is not supported by substantial evidence because Haulers presented no proof that they had contracts with the customers they lost as a result of the County's violation of section 260.247, in that there were no contracts introduced into evidence and Ficken testified that Haulers' customers did not have contracts for trash collection services but simply prepaid for services on a quarterly basis. Ficken's calculation of lost profits was based on, *inter alia*, the number of customers lost to each Hauler as a result of the County's trash program and each lost customer's monthly rate.

14

The County asserts that Haulers were required to prove they had contracts with the customers they lost order to recover damages pursuant to language set forth in *American Eagle II*, where the Supreme Court stated that Haulers were entitled to damages based upon Haulers' "contract" and "contract price." *See id.* at 832, 833. The County interprets the terms "contract" and "contract price" as requiring Haulers to have had two-year, long-term contracts with their customers in order to recover damages. We disagree.

It is important to examine the context of the Missouri Supreme Court's language and use of the terms "contract" and "contract price" in its determination of the appropriate measurement of Haulers' damages. In its analysis, the Supreme Court first examined Haulers' rights and obligations under section 260.247. *Id*. at 831-33. In interpreting section 260.247, the Court found that Haulers were entitled to notice by certified mail of the County's intent to provide trash collection services and the County was prohibited from commencing trash collection for two years, unless it hired Haulers. *Id*. at 832. The Court also found that, "if [the] County chose to *contract with Haulers* during the two-year waiting period, [the] County cannot *contract with Haulers* for a lower price than they otherwise would have received in that two-year time frame." *Id*. (emphasis added). The Supreme Court concluded that subsections 1, 2, and 3 of section 260.247, when read together, entitled Haulers to continue providing trash collection services for two years. *Id*. The Court further provided that "[the] County either could have allowed *Haulers to provide services directly to clients* for that [two-year] period or could have contracted with Haulers to provide the same services through the County for that period – but *only if [the] County's contract with Haulers was for the same amount*." *Id*. (emphasis added) (emphasis omitted).

Only after providing that interpretation of section 260.247 did the Supreme Court set forth the language relied on by the County, specifically that (1) "[the] County must pay Haulers that to which they were entitled: the amount they would have received under their *contract* during the two-year waiting period"; and (2) Haulers are entitled to "their projected receipts from their *contract price* [for their services], minus any business and operational costs Haulers would have incurred while providing [trash] collection services, considering all the circumstances." *Id*. at 832, 833 (quotations omitted) (emphasis added). In light of the context of this language which is set out above, we find that the Supreme Court's use of the terms "contract" and "contract price" refer to the amount Haulers would have received from a contract *with the County* during the two-year waiting period. *See id*. at 832. Such a contract would had to have been "for the same amount" that Haulers would have charged to "provide services directly to clients for that period." *Id*. (emphasis omitted). At no point does the Missouri Supreme Court set forth an expectation or requirement that Haulers must have had long-term contracts, or any other contracts, with their customers in order to receive the protection of section 260.247. Accordingly, we hold that Haulers were entitled to damages for lost profits in the amount they would have charged to provide trash collection services directly to customers during the two-year waiting period, and Haulers did not have to prove that they had contracts with the customers they lost as a result of the County's violation of section 260.247 in order to recover damages. Therefore, it was sufficient for Ficken's calculation of Haulers' lost profits to be based upon, *inter alia*, the number of customers lost to each Hauler as a result of the County's trash program and each lost customer's monthly rate.

### c.      Challenges to Ficken's Expert Testimony

We now turn to the County's argument that the trial court's award of damages for lost profits is not supported by substantial evidence because Ficken's opinion as to Haulers' damages for lost profits was based on facts and data he received from Haulers and of which he had no first-hand knowledge.

"[The] admission of expert evidence requires the trial court to apply the same standards for relevance and admissibility that apply to other types of evidence.  The trial court's navigation of such waters is entitled to substantial deference regardless of the type of evidence being offered." *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 451 n.2 (Mo. banc 2014).  A trial court has considerable discretion in the admission of evidence, and its decision will not be reversed unless there is a clear abuse of discretion. *Id*. at 451.  An abuse of discretion occurs when the trial court's decision "is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id*. (quotations omitted).  No abuse of discretion occurs if reasonable persons could differ as to the propriety of the trial court's decision. *Id*.

In this case, Ficken formulated an opinion as to each Hauler's lost profits for the two-year waiting period by relying on information provided to him by Haulers, specifically Haulers' databases of customers and Haulers' unaudited profit and loss statements from 2006 through 2010.  In order to determine lost revenue, Ficken used raw data from each Hauler's database of customers that were lost as a result of the County's trash program.  This data allowed Ficken to see each customer's name, address, the type of services provided by Haulers, his or her monthly rate, and the start and end dates of service.  This information was provided to Ficken by Haulers via a "data dump":

17

Counsel: So is your understanding then that the information you have, the data you collected is reflective of the actual databases used by the haulers?

Ficken: Oh, that's correct. It's a live system. We took a mirror image of the database of those customers which reflect the most current information from them. So that is the source document we relied on. It's the actual live data.

Ficken verified the information provided by Haulers by comparing the customers' addresses to a mapping program to confirm that the addresses were actually located within the identified districts subject to the County's trash program. Once the lost customers' properties had been confirmed, Ficken was able to identify the revenue associated with the lost services for each property based upon each lost customer's monthly rate, and he multiplied that amount by twenty-four months to account for the two-year waiting period.

Ficken then determined Haulers' expenses associated with the generation of lost revenue, what he referred to as "variable costs,"[4] by reviewing Haulers' unaudited profit and loss statements from 2006 through 2010. Ficken explained that "[d]etermining variable costs is a matter of obtaining profit and loss statements and reviewing the individual line item expenses to understand the nature of the expense, how it's affected by daily operations, its ties to revenue, and just overall professional judgment and experience." After Ficken calculated each Hauler's variable costs, he deducted those expenses from the lost revenue, and arrived at his calculation for lost business profits for each Hauler. Ficken testified that reducing revenue by variable costs was a methodology that "experts in [his] field would normally use to calculate lost business profits."

---

[4] Ficken explained that "variable costs" is another term for "overhead expenses tied to the production of revenue," which was the term used by the Supreme Court in *American Eagle II*. *See American Eagle II*, 379 S.W.3d at 833 ("[i]n general, in calculating lost profits damages, *lost revenue* is estimated, and *overhead expenses tied to the production of that income* are deducted from the estimated lost revenue") (quoting *Ameristar*, 155 S.W.3d at 55) (emphasis added).

Haulers did not present any contrary evidence or witnesses or another expert's opinion as to how lost profits should be calculated. Ficken testified that he had "[no] reason to doubt the accuracy of the information" he was given by Haulers and that he did not "find any reason in [his] opinion, that the information provided to [him] was unreliable." There was no evidence or expert testimony offered by Haulers to controvert this portion of Ficken's testimony. Additionally, Ficken testified on numerous occasions that in forming his opinion as to the amount of Haulers' lost profits, he used information reasonably relied on by experts in his field. Again, there was no evidence or expert testimony offered by Haulers to controvert this portion of Ficken's testimony.

Section 490.065 RSMo 2000[5] governs the admission of expert testimony. *Doe v. McFarlane*, 207 S.W.3d 52, 62 (Mo. App. E.D. 2006). The statute provides in relevant part:

1. In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

2. Testimony by such an expert witness in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

3. The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

Section 490.065.

In this case, the County contends that Ficken's opinion is not reasonably reliable under section 490.065.3. The County asserts that Ficken's opinion as to Haulers' damages for lost

---

[5] All further references to section 490.065 are to RSMo 2000.

profits is not reasonably reliable because it was based on facts and data he received from Haulers (Haulers' databases of customers and Haulers' unaudited profit and loss statements) which constituted hearsay and of which Ficken had no first-hand knowledge.

Section 490.065.3 expressly provides that "[t]he facts or data in a particular case upon which an expert bases an opinion or inference *may be those* perceived by or *made known to him . . . before the hearing*." (emphasis added). Consequently, "[m]erely because an expert relied on information and the opinions of others does not automatically disqualify his testimony," and "[a]n expert may base his opinions on facts and data derived from sources outside of court and other than by his own perceptions." *Freight House Lofts Condo Ass'n. v. VSI Meter Services, Inc.*, 402 S.W.3d 586, 596 (Mo. App. W.D. 2013) (quotations omitted). In fact, in most cases, expert witness opinion testimony is based on facts on which the expert did not personally observe and of which the expert did not have any personal knowledge. *CADCO, Inc. v. Fleetwood Enterprises, Inc.*, 220 S.W.3d 426, 434 (Mo. App. E.D. 2007).

The County argues that because Ficken's opinion was based on facts and data he received from Haulers and of which he had no first-hand knowledge, the County was unable to challenge the veracity and credibility of the sources and bases of Ficken's opinion, and therefore, his opinion lacked foundation and was inadmissible. A similar argument was rejected in *Wulfing v. Kansas City Southern Industries, Inc.*, 842 S.W.2d 133, 151-52 (Mo. App. W.D. 1992) (overruled on other grounds).

In *Wulfing*, the appellant argued that the expert's opinion lacked foundation and was inadmissible because the facts and data underlying his opinion included information supplied by sources not available for cross-examination and for whose reliability the expert was "unable to

20

vouch." *Id*. at 144, 151. The Western District disagreed, holding that since the enactment of section 490.065.3,

> where expert opinion rests in part on factual information not in evidence, the standard objection such as that there is no opportunity to test the credibility of its sources at the trial or to cross-examine the witness as to the extrajudicial facts no longer avails, either as to the reasonableness of the foundation for the opinion or to the opinion itself.

*Id*. at 151-52. Instead, the relevant issues to be decided under section 490.065.3 are "whether the hearsay as tested by professional acceptance standards in the field is reasonably reliable, and whether it is otherwise reasonably reliable as a matter of general evidentiary principle." *Id*. at 152.

We find that the Western District's analysis in *Wulfing* is instructive, especially in light of our Court's holding in *CADCO* that the facts and data on which an expert relies in forming his opinion need not be independently admissible if, pursuant to the requirements of section 490.065.3, (1) the facts and data are reasonably relied upon by experts in the field; and (2) the facts and data are otherwise reasonably reliable. *CADCO*, 220 S.W.3d at 434; section 490.065.3. "[I]n determining whether the facts and data are reasonably relied upon by experts in the field, the trial court is generally expected to defer to the expert's assessment of which data is reasonably reliable." *CADCO*, 220 S.W.3d at 434. In ascertaining whether the facts and data are otherwise reasonably reliable, the trial court must look beyond the expert's testimony and ensure that the sources relied upon by the expert in forming his opinion are not so slight as to be fundamentally unsupported. *Id*.; *see Doe*, 207 S.W.3d at 62 ("[o]nly in cases where the sources relied on by the expert are so slight as to be fundamentally unsupported, should the opinion be excluded because testimony with that little weight would not assist the [finder of fact]") (quotations omitted).

In this case, Ficken repeatedly testified that in forming his opinion as to Haulers' lost profits, he used a methodology and information which was reasonably relied on by experts in his field. The County put on no evidence to contradict Ficken's assertions. The trial court deferred to Ficken's testimony and found the facts and data upon which he relied were of a type reasonably relied upon by experts in the field, which the court was expected and entitled to do. *CADCO*, 220 S.W.3d at 434; *see Doe*, 207 S.W.3d at 63 (finding that an expert's assessment as to reliability is entitled to deference in the situation where the defendant puts on no contradictory evidence). Therefore, the trial court did not err in finding that the facts and data relied upon by Ficken were reasonably relied upon by experts in his field.

The trial court also found that the facts and data upon which Ficken relied (Haulers' databases of customers and Haulers' unaudited profit and loss statements) were otherwise reasonably reliable, i.e., that the sources relied upon by Ficken in forming his opinion were not so slight as to be fundamentally unsupported. We cannot hold the trial court erred in making this finding for two reasons. First, the County did not present any evidence or expert testimony which could have challenged the reliability of the sources of Ficken's opinion. The County had the opportunity to introduce evidence or expert testimony which might have convinced the trial court that Ficken's opinion was wrong or based upon unreliable information, but the County failed to do so. *See Massachusetts General Life Ins. Co. v. Sellers*, 835 S.W.2d 475, 477, 479-80 (Mo. App. S.D. 1992) (finding expert could rely on out-of-court records in formulating his opinion where defendant did not introduce other records or evidence which might have convinced the trial court that the expert's opinion was wrong).

Second, any weakness in the factual underpinnings of Ficken's testimony and any question as to the sources and basis of his opinion did not affect the admissibility of Ficken's

testimony but went to his credibility and the weight to be given to his testimony. *Alcorn v. Union Pacific R.R. Co.*, 50 S.W.3d 226, 246 (Mo. banc 2001) (abrogated on other grounds); *Freight House*, 402 S.W.3d at 596; *Doe*, 207 S.W.3d at 62. The County could have engaged in discovery, obtained the facts and data upon which Ficken relied in forming his opinion, and then subjected Ficken's opinion relating to those facts and data to cross-examination and impeachment. However, the County failed to do so. In this case, the trial court relied on Ficken's testimony in calculating Haulers' damages for lost profits, implicitly finding that Ficken was credible and that his opinion was entitled to great weight. *See In re Marriage of Mapes*, 848 S.W.2d 634, 638 (Mo. App. S.D. 1993) (the trial court's judgment can reveal the court's implicit credibility determinations). Our Court defers to those findings. *See Exchange Bank of Missouri v. Gerlt*, 367 S.W.3d 132, 136 (Mo. App. W.D. 2012) (finding an appellate court defers to the trial court's credibility determinations, that the trial court is "free to believe or disbelieve all or part of the witnesses' testimony," and that the trial court is free to assess the weight to be given to expert testimony) (quotations omitted); *Doe*, 207 S.W.3d at 62 (the appropriate weight to be given to expert testimony is properly left to the finder of fact).

Therefore, it was permissible for Ficken's opinion as to Haulers' damages for lost profits to be based on Haulers' databases of customers and Haulers' profit and loss statements, i.e., facts and data he received from Haulers and of which he had no first-hand knowledge. *See Freight House*, 402 S.W.3d at 596-97 (finding the trial court did not err in admitting expert opinion testimony which was not based upon his first-hand knowledge); *CADCO*, 220 S.W.3d at 431, 433-35 (under plain error review, finding expert testimony about plaintiff-company's lost profits had a sufficiently reliable evidentiary foundation where expert based his opinion on, *inter alia*,

23

data collected from interviews with the company president and the company's financial statements). The trial court did not abuse its discretion in admitting Ficken's expert testimony.

### d. Alleged Flaws in Ficken's Methodology

Finally, we address the County's argument that the trial court's award of damages for lost profits is not supported by substantial evidence because Ficken's methodology in calculating Haulers' damages for lost profits was flawed.

The County asserts that Ficken's calculation of Haulers' damages for lost profits is flawed because, (1) he included revenues Haulers would have received from customers who elected to halt trash collection services before the County's program was put into place; and (2) he reviewed Haulers' unaudited profit and loss statements instead of Haulers' income tax returns. The County contested those two portions of Ficken's methodology relating to factual issues through cross-examination. *See Pearson v. Koster*, 367 S.W.3d 36, 44 (Mo. banc 2012) (a party may contest a factual issue by, *inter alia*, cross-examining a witness). Once those issues were contested, the trial court was free to believe or disbelieve any, all, or none of Ficken's testimony, and "the appellate court's role is not to re-evaluate [the] testimony through its own perspective." *Id*. (quotations omitted).

As previously indicated in Section II.B.1.c., Ficken explained his methodology and the rationale for which it was based, and the trial court accepted his methodology,[6] which it was free to do. *See Green v. Beagle-Chilcutt Painting Co., Inc.*, 726 S.W.2d 344, 354-55 (Mo. App. W.D. 1987) (rejecting challenge to expert's methodology for calculating lost profits where expert explained his methodology and the rationale upon which it was based, finding that methodology

---

[6] The trial court found that Ficken appropriately calculated the lost profits of each Hauler by calculating lost revenue based upon the number of customers each Hauler lost in the two-year waiting period and then deducting the overhead expenses tied to the production of that revenue. However, as discussed below in Section II.C., the trial court rejected the portion of Ficken's opinion which included damages for growth, rate increases, disposal fees, uncollectible accounts receivable, and layoff costs in his assessment of Haulers' lost profits.

was not inadmissible, but rather, was for the finder of fact to accept or reject). We defer to the trial court on factual issues because it is in the superior position to judge the credibility, sincerity, and character of the witnesses, as well as other trial intangibles which may not be completely revealed by the record on appeal. *Pearson*, 367 S.W.3d at 44. Additionally, the County had the opportunity to introduce evidence or expert testimony which might have convinced the trial court that Ficken's opinion was wrong, but the County failed to do so. *See Massachusetts General*, 835 S.W.2d at 479-80 (finding trial court did not err in admitting expert opinion where defendants did not introduce other records or evidence which might have convinced the trial court that expert's opinion was wrong). Therefore, the County's argument, that the trial court's award of damages for lost profits is not supported by substantial evidence because Ficken's methodology in calculating the County's damages for lost profits was flawed, has no merit.

### e. Conclusion as to the County's First Point on Appeal

Based on the foregoing, the County's arguments as to why the trial court's award of damages for lost profits is not supported by substantial evidence lack merit. Furthermore, we hold that the trial court's judgment awarding Haulers damages is supported by substantial evidence because Haulers established the fact of damages and the amount of damages with reasonable certainty. *See Ameristar*, 155 S.W.3d at 54 (in order to receive an award of damages for lost profits, a plaintiff must set forth evidence which provides an adequate basis for estimating the lost profits with reasonable certainty).

We find that Haulers established the fact of damages within reasonable certainty because, (1) in *American Eagle II*, 379 S.W.3d at 831, the Supreme Court held the County was liable to Haulers for violating section 260.247; (2) it is undisputed that Haulers lost customers as a result of the County's implementation of its trash program; and (3) as we held in Section II.B.1.b,

25

Haulers were entitled to damages for lost profits in the amount they would have charged to provide trash collection services directly to customers during the two-year waiting period.

In order to assess whether Haulers established the amount of damages within reasonable certainty, we must turn to Ficken's testimony, noting that it is not fatal to Haulers' damages claim *if* their loss defies exact proof. *See Ameristar*, 155 S.W.3d at 55 (stating that if the evidence in a case involving lost profits demonstrates that a party had a substantial pecuniary loss, but it is apparent that the loss is of a character which defies exact proof, a lesser degree of certainty as to the amount of the loss is required, leaving a greater degree of discretion to the finder of fact as to the amount of damages to be awarded). As we previously indicated, Ficken calculated Haulers lost profits by calculating lost revenue based upon the number of customers each Hauler lost in the two-year waiting period and then deducting the overhead expenses tied to the production of that revenue. In making that calculation, Ficken used raw data from each Hauler's database of customers that were lost as a result of the County's trash program, which he was permitted to do. This raw data allowed Ficken to see each customer's name, address, the type of services provided by Haulers, his or her monthly rate, and the start and end dates of service. Ficken verified the information provided by Haulers by comparing the customers' addresses to a mapping program to confirm that the addresses were actually located within the identified districts subject to the County's trash program. Once the lost customers' properties had been confirmed, Ficken was able to identify the revenue associated with the lost services for each property based upon the each lost customer's monthly rate, and he multiplied that amount by twenty-four months to account for the two-year waiting period.

Ficken then determined Haulers' expenses associated with the generation of lost revenue, what he referred to as "variable costs,"[7] by reviewing Haulers' unaudited profit and loss statements from 2006 through 2010, which he was permitted to do. Ficken explained that "[d]etermining variable costs is a matter of obtaining profit and loss statements and reviewing the individual line item expenses to understand the nature of the expense, how it's affected by daily operations, its ties to revenue, and just overall professional judgment and experience." After Ficken calculated each Hauler's variable costs, he deducted those expenses from the lost revenue, and arrived at his calculation for lost business profits for each Hauler. Ficken testified that reducing revenue by variable costs was a methodology that "experts in [his] field would normally use to calculate lost business profits." Ficken's assessment of lost profits also included damages for growth, rate increases, disposal fees, uncollectible accounts receivable, and layoff costs.

The trial court did not accept Ficken's entire opinion as to damages, in that, as discussed below in Section II.C., the court rejected the portion of Ficken's opinion which included damages for growth, rate increases, disposal fees, uncollectible accounts receivable, and layoff costs in his assessment of lost profits. However, the trial court otherwise accepted Ficken's opinion, which it was entitled to do, finding that Ficken appropriately calculated the lost profits of each Hauler by calculating lost revenue based upon the number of customers each Hauler lost in the two-year waiting period and then deducting the overhead expenses tied to the production

---

[7] As previously stated in footnote 4 of this opinion, Ficken explained that "variable costs" is another term for "overhead expenses tied to the production of revenue," which was the term used by the Supreme Court in *American Eagle II. See American Eagle II*, 379 S.W.3d at 833 ("[i]n general, in calculating lost profits damages, *lost revenue* is estimated, and *overhead expenses tied to the production of that income* are deducted from the estimated lost revenue") (quoting *Ameristar*, 155 S.W.3d at 55) (emphasis added). In addition, Ficken testified that his determination of "variable costs" included Haulers' expenses for payroll taxes, fuel expenses, uniforms, postage, office supplies, and other related expenses identified in Schedule C of Haulers' Exhibit No. 7.

27

of that revenue.  We find that Haulers, through Ficken's testimony, established their amount of damages for lost profits with reasonable certainty.

Because Haulers established the fact of damages and the amount of damages with reasonable certainty, the trial court's judgment awarding Haulers damages is supported by substantial evidence.  *See id*. at 54.  The County's first point on appeal is denied.

### 2. The Trial Court's Award of Damages is Not Against the Weight of the Evidence

In the County's second point on appeal, it asserts the trial court's award of damages is against the weight of the evidence.  Our Court will only set aside a judgment as "against the weight of the evidence" if we have a firm belief that the judgment is wrong.  *Scheck*, 435 S.W.3d at 717 (quotations omitted).

The argument portion of the County's second point on appeal, which is less than two pages long, merely incorporates the County's arguments set forth in their first point on appeal – whether Haulers were required to prove past profits and expenses, whether Haulers were required to prove they had contracts with their lost customers, challenges to Ficken's expert testimony, and alleged flaws in Ficken's methodology.  In Section II.B.1., we found those arguments have no merit.  Therefore, we do not have a firm belief that the trial court's judgment is wrong, and the trial court's award of damages is not against the weight of the evidence.  The County's second point on appeal is denied.

### 3. The County's Argument that Haulers Failed to State a Claim for Which Relief Could be Granted is Barred by The Law of the Case

In the County's third and final point on appeal, it asserts the trial court erred in awarding Haulers damages because Haulers failed to state a claim for which relief could be granted "in that section 260.247 . . . is inapplicable to [the] County due to [the] County's superior

constitutional grant of legislative power with respect to the municipal function of [trash] collection."

The County previously raised this argument in its motion to dismiss Haulers' declaratory judgment claim, and the argument was addressed and rejected by our Court in *American Eagle I*. 272 S.W.3d at 341-44. We held that section 260.247 applied to the County, despite its charter status, because it involves the state-wide public policy to "provide an entity engaged in [trash] collecting with sufficient notice to make necessary business adjustments prior to having its services terminated in a given area." *Id*. at 341-42 (quotations omitted). Accordingly, we also held the County must comply with the two-year notice provision set forth in section 260.247 if the County chose to enter the business of trash collection and take it out of the hands of existing private collectors. *Id*. at 343.

Subsequent to the decision in *American Eagle I*, the County again argued that section 260.247 does not apply to the County because its status as a charter county allows it to regulate municipal functions including trash collection, this time to the Missouri Supreme Court in *American Eagle II*. 379 S.W.3d at 823, 824. The Missouri Supreme Court declined to consider the merits of the County's argument and instead found that it was barred by the "law of the case." *Id*. at 824-25.

As explained by the Supreme Court, a previous holding by an appellate court on an issue constitutes the law of the case, precluding re-litigation of the issue in a subsequent appeal. *Id*. at 825. "The doctrine of law of the case is necessary to ensure uniformity of decisions, protect the parties' expectations, and promote judicial economy." *Id*. In addition, when there is no demonstrable error in an appellate court's decision, the law of the case is particularly appropriate. *Id*.

29

In determining that the County's claim was barred by the law of the case, the Supreme Court quoted this Court's decision in *American Eagle I*, found that the "[t]he court of appeals previously considered th[e] argument on the merits and discussed the proper interpretation of section 260.247 at length before rejecting [the] County's position," and found there was "no demonstrable error in the first appellate decision." *Id*. at 824-25. Accordingly, the Supreme Court held that "it is the law of the case that [the] County was required to adhere to section 260.247's requirements" and "[the] County cannot have multiple bites at the apple in attempting to determine this issue favorably." *Id*. at 825.

Following the decision of the Supreme Court in *American Eagle II*, we decline to consider the merits of the County's claim that section 260.247 does not apply to the County and find that it is the law of the case that the County is required to adhere to the requirements of section 260.247. *See Grieshaber v. Fitch*, 409 S.W.3d 435, 443 (Mo. App. E.D. 2013) (finding "we are bound by the Missouri Supreme Court's decisions"). The County's third point on appeal is denied.

## C.    Haulers' Cross-Appeal

Haulers present one point on cross-appeal, asserting the trial court's calculation of damages was erroneous. Haulers argue that the trial court erred in rejecting the portion of Ficken's opinion which included damages for growth, rate increases, disposal fees, uncollectible accounts receivable, and layoff costs in his assessment of Haulers' lost profits. As an alternative argument, Haulers contend that that assuming the trial court correctly excluded growth and rate increases in its calculation of damages, the trial court erred in deducting Haulers' saved expenses in those categories.

30

Determinations of witness credibility and the weight to be given to expert testimony are properly left to the finder of fact, and our Court defers to the trial court's determinations regarding those issues in a court-tried case. *See Exchange Bank*, 367 S.W.3d at 136 (finding an appellate court defers to the trial court's credibility determinations, that the trial court is "free to believe or disbelieve all or part of the witnesses' testimony," and that the trial court is free to assess the weight to be given to expert testimony) (quotations omitted); *Doe*, 207 S.W.3d at 62 (the appropriate weight to be given to expert testimony is properly left to the finder of fact).

> 1. **The Trial Court Did Not Err in Finding Haulers' Recovery Should Not Include Damages for Growth, Rate Increases, Disposal Fees, Uncollectible Accounts Receivable, and Layoff Costs**

We first turn to the Haulers' argument that the trial court erred in rejecting the portion of Ficken's opinion which included damages for growth, rate increases, disposal fees, uncollectible accounts receivable, and layoff costs in his assessment of Haulers' lost profits. The trial court excluded those categories of damages on the grounds they were too speculative or were otherwise inappropriate for the calculation of damages.

When factual issues are contested, a trial court is free to believe or disbelieve any, all, or none of the testimony presented, and "the appellate court's role is not to re-evaluate [the] testimony through its own perspective." *Pearson*, 367 S.W.3d at 44 (quotations omitted). We defer to the trial court on factual issues because it is in the superior position to judge the credibility, sincerity, and character of the witnesses, as well as other trial intangibles which may not be completely revealed by the record on appeal. *Id.*

In this case, Ficken included growth in his calculation of each Hauler's damages and rate increases in his calculation of damages for Meridian and Waste Management. Ficken also

31

included disposal fees, uncollectible accounts receivable, and layoff costs in his calculation of Waste Management's damages.

During cross-examination of Ficken, the County contested the inclusion of growth, rate increases, disposal fees, uncollectible accounts receivable, and layoff costs in his calculation of Haulers' damages. *See id.* (a party may contest a factual issue by, *inter alia*, cross-examining a witness). Ficken admitted on cross-examination that his inclusion of damages for growth "represents revenue that . . . [Haulers] lost from customers they never had . . .." Ficken also stated on cross-examination that he used rate increases in his calculation of Meridian's damages even though the company president refused to provide Ficken with the backup information he requested. Additionally, Ficken testified that the inclusion of disposal fees in his calculation of Waste Management's damages was for fees American Eagle was no longer paying to dump trash at Waste Management's landfill. Ficken admitted on cross-examination that this "element of damages is caused by a loss of business from American Eagle" and "[i]t does not come from losing customers of Waste Management." Regarding the inclusion of damages for uncollectible accounts receivable, Ficken admitted on cross-examination that nothing prevented Waste Management from filing suit or taking other action to recover amounts for accounts receivable which were uncollectible from customers. Finally, Ficken testified during cross-examination that although he included layoff costs in his calculation of Waste Management's damages, he was not aware of any contractual requirements providing Waste Management had to pay severance payments to its laid off employees.

Once those portions of Ficken's methodology relating to factual issues were contested, the trial court was free to find that Ficken's testimony regarding damages for growth, rate increases, disposal fees, uncollectible accounts receivable, and layoff costs lacked credibility and

32

was, instead, speculative and deserving of little or no weight on the topic of Haulers' damages for lost profits. *Id*.; *See Exchange Bank*, 367 S.W.3d at 135-36 (finding that "the trial court was free to find that [expert] testimony lacked credibility and was, instead, speculative and deserving of little or no weight on [a] topic"). Because we defer to the trial court's findings as to credibility and weight, and because the trial court's calculation of damages was within the range of the evidence presented, we find the trial court did not err in finding Haulers' recovery for lost profit damages should not include damages for growth, rate increases, disposal fees, uncollectible accounts receivable, and layoff costs. *See Brittany Sobery Family Ltd. Partnership v. Coinmach Corp.*, 392 S.W.3d 46, 52 (Mo. App. E.D. 2013) (stating that "[w]hen the trial court calculates an amount that is within the range of evidence, an appellate court generally will decline to find the determination erroneous or to weigh the evidence") (quotations omitted); *Exchange Bank*, 367 S.W.3d at 136 (finding trial court did not err in limiting plaintiff's recovery where trial court found expert's testimony was speculative and deserving of little or no weight).

2.    **The Trial Court Did Not Err in Deducting Haulers' Saved Expenses in the Categories of Growth and Rate Increases**

Haulers also argue that assuming the trial court was correct in excluding growth and rate increases in its calculation of damages, the trial court erred in "deduct[ing] Haulers' saved expenses in those categories, and thereby shorted Haulers' damages award in the amount of $2,239,672[.00]." In support of this argument, Haulers only cite to an affidavit prepared by Ficken after the trial court entered its judgment in the instant case. Ficken's affidavit was submitted to the trial court along with Haulers' motion to amend the trial court's judgment, which the trial court denied.

33

Rule 78.05[8] authorizes affidavits to be submitted in connection with after-trial motions where the issue raised in the after-trial motion requires resolution of factual matters not based on facts in the record. Rule 78.05; *Powell v. State Farm Mut. Auto. Ins. Co.*, 173 S.W.3d 685, 689 (Mo. App. W.D. 2005). A trial court has the discretion to disbelieve an affidavit submitted pursuant to Rule 78.05 even when it is unchallenged, and we defer to the trial court's credibility findings. *Manning v. Manning*, 292 S.W.3d 459, 466-67 (Mo. App. E.D. 2009).

In this case, the trial court denied Haulers' motion to amend the judgment, implicitly finding that it did not believe Ficken's affidavit and that his opinion set forth in the affidavit was entitled to no weight. *See In re Marriage of Mapes*, 848 S.W.2d at 638 (the trial court's decision can reveal the court's implicit credibility determinations). It was within the trial court's discretion to disbelieve Ficken's affidavit even though it was unchallenged, and we defer to the trial court's credibility findings in this regard. *Manning*, 292 S.W.3d at 466-67. Accordingly, the trial court did not err in deducting Haulers' saved expenses in the categories of growth and rate increases.

### 3. Conclusion as to Haulers' Cross-Appeal

Haulers have not demonstrated that the damages awarded are clearly wrong, could not have been reasonably determined, and of course Haulers have not argued that the damages were excessive. Therefore, we find that the trial court did not err in its calculation of Haulers' damages. *Scheck*, 435 S.W.3d at 731 ("[t]he trial court's findings as to damages are entitled great weight and this Court will not disturb these findings unless the damages awarded are clearly wrong, could not have been reasonably determined, or were excessive") (quotations omitted). Haulers' sole point on cross-appeal is denied.

---

[8] All references to Rules are to Missouri Supreme Court Rules (2014).

### III.    CONCLUSION

The judgment awarding American Eagle $593,489.00 in damages, awarding Meridian $384,486.00 in damages, and awarding Waste Management $4,944,790.00 in damages is affirmed.

_____
ROBERT M. CLAYTON III, Judge

Patricia L. Cohen, P.J., and
Roy L. Richter, J., concur.